IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| FORKS SPECIALTY METALS INC., | ) | Case No. 17-18601-mdc |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LYNN E. FELDMAN, ESQUIRE, | ) | |
| Trustee for the ESTATE OF FORKS | ) | Adversary No. 19-00028-mdc |
| SPECIALTY METALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRAND RIVER IRONSANDS | ) | |
| INCORPORATED, NORTH ATLANTIC | ) | |
| IRON CORPORATION, METALO | ) | |
| MANUFACTURING INC. f/k/a MUSKRAT | ) | |
| MINERALS INCORPORATED, and | ) | |
| FRANCIS MACKENZIE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

For the reasons stated in their Brief in Support filed contemporaneously herewith,

Defendants Grand River Ironsands Incorporated, North Atlantic Iron Corporation, Metalo

Manufacturing Incorporated and Francis MacKenzie respectfully request that the Court dismiss

Chapter 7 Trustee's Complaint in its entirety and with prejudice.

Respectfully Submitted,

COHEN & GRIGSBY, P.C.

By:   s/Fridrikh V. Shrayber
      Fridrikh V. Shrayber (Pa. I.D. No. 208083)
      Katie R. Jacobs (Pa. I.D. No. 307385)
      (admission *pro hac vice* forthcoming)
625 Liberty Avenue
Pittsburgh, PA  15222-3152
Ph: (412) 297-4900 / Fax: (412) 209-0672
fshrayber@cohenlaw.com
kjacobs@cohenlaw.com

Attorneys for Defendants
Grand River Ironsands Incorporated, North Atlantic
Iron Corporation, Metalo Manufacturing Incorporated
and Francis MacKenzie

Dated:  June 17, 2019
3048376.v1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| FORKS SPECIALTY METALS INC., | ) | Case No. 17-18601-mdc |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LYNN E. FELDMAN, ESQUIRE, | ) | Adversary No. 19-00028-mdc |
| Trustee for the ESTATE OF FORKS | ) | |
| SPECIALTY METALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRAND RIVER IRONSANDS | ) | |
| INCORPORATED, NORTH ATLANTIC | ) | |
| IRON CORPORATION, METALO | ) | |
| MANUFACTURING INC. f/k/a MUSKRAT | ) | |
| MINERALS INCORPORATED, and | ) | |
| FRANCIS MACKENZIE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO
STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 1

    A.  The Parties .................................................................................................. 1

        1.  Metalo Manufacturing Incorporated ............................................ 1

        2.  Grand River Ironsands Incorporated ............................................ 2

        3.  North Atlantic Iron Corporation ................................................... 3

        4.  Francis MacKenzie ....................................................................... 4

        5.  Forks Specialty Metals Incorporated ........................................... 4

    B.  The Trustee's Claim .................................................................................... 8

III.  LEGAL ARGUMENT ......................................................................................... 9

    A.  This Court Lacks Personal Jurisdiction Over the Defendants ................... 9

        1.  Legal Standard .............................................................................. 9

        2.  This Court Does Not Have General Jurisdiction Over Any of the
            Defendants .................................................................................. 11

        3.  This Court Does Not Have Specific Jurisdiction Over Any of the
            Defendants ..................................................................................  12

        4.  The Trustee's Theory of Jurisdiction is Meritless ...................  16

    B.  The Complaint Fails to State a Cognizable Claim for Relief .............. 28

        1.  Legal Standard ........................................................................... 28

        2.  The Complaint Contains No Facts Supporting a Veil-Piercing
            Claim .......................................................................................... 29

IV.  CONCLUSION ...................................................................................................  32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411 (E.D. Pa. 2005) ........................... 19

*Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*,
846 A.2d 1264 (Pa. Super. Ct. 2004) ...................................................................... 29

*Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830 (E.D. Pa. 1997) ........................ 18, 25, 26

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102 (1987) ..................................... 12, 32

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................................ 29

*Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007) ...................................................... 29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 28, 29

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ......................................................... 12

*Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925) ................................... 17

*Car Sense, Inc. v. Am. Special Risk, LLC*, 56 F. Supp. 3d 686 (E.D. Pa. 2014) ........................... 24

*Carmen Enters., Inc. v. Murpenter, LLC*, 185 A.3d 380 (Pa. Super. Ct. 2018) ........................... 13

*Carteret Savings Bank, F.A. v. Shushan*, 954 F.2d 141 (3d Cir. 1992) ....................... 10

*Chavez v. Dole Food Company*, Inc., 836 F.3d 205 (3d Cir. 2016) ...................................... 11, 12

*Clark v. Matsushita Elec. Indus. Co.*, 811 F. Supp. 1061 (M.D. Pa. 1993) ................................. 26

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ............................................................... 11

*Essex Insurance Co. v. Miles*, No. CIV.A. 10-3598, 2010 WL 5069871
(E.D. Pa. Dec. 3, 2010) ........................................................................................ 31

*Gen. Electric Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001) ...................................... 11

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................................. 11

*In re Celotex Corp.*, 124 F.3d 619 (4th Cir. 1997) ...................................................... 10

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538 (M.D. Pa. 2009) .............. 18

**Page(s)**

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*,
735 F. Supp. 2d 277 (W.D. Pa. 2010) ....................................................................... 17

*In re Flabeg Solar US Corp.*, 561 B.R. 364 (Bankr. W.D. Pa. 2016) ...................................... 9, 10

*Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1098 (W.D. Pa. 1980) ........... 16, 27

*In re Commodore Int'l, Ltd.*, 242 B.R. 243 (Bankr. S.D.N.Y. 1999) ......................................... 15

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)............................................ 28

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .................................................... 9, 10

*Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290 (3d Cir. 2008) ................................................. passim

*Koch v. Pechota*, 744 F. App'x 105 (3d Cir. 2018) ................................................................... 12

*Lionti v. Dipna, Inc.*, Civ. No. 17-1678, 2017 WL 2779576 (E.D. Pa. June 27, 2017)............... 10

*Lomas v. Kravitz*, 130 A.3d 107 (Pa. Super. Ct. 2015) ............................................................. 30

*Marten v. Godwin*, 499 F.3d 290 (3d Cir. 2007) ...................................................................... 11

*McCann v. Newman Irrevocable Trust*, 458 F.3d 281 (3d Cir. 2006)......................................... 12

*Mellon Bank (East) PSFS, N.A. v. Farino*, 960 F.2d 1217 (3d Cir. 1992) .................................. 10

*Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429 (5th Cir. 2014) ............................................ 11

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007).............................................. 12

*Partners Coffee Co., LLC v. Oceana Services & Products Co.*, 700 F. Supp. 2d 720
(W.D. Pa. 2010) ...................................................................................................... 30

*Poe v. Babcock Int'l, plc.*, 662 F. Supp. 4 (M.D. Pa. 1985) ...................................................... 26

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140
(3d Cir. 1972)......................................................................................................... 17

*Savin Corp. v. Heritage Copy Prod., Inc.*, 661 F. Supp. 463 (M.D. Pa. 1987) ............... 16, 19, 25

*Shenango Inc. v. Am. Coal Sales Co.*, No. 2:06-CV-149, 2007 WL 2310869
(W.D. Pa. Aug. 9, 2007) ....................................................................................... 30, 31

*Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*,
360 F. Supp. 2d 665 (E.D. Pa. 2005) ...................................................................... 18

*Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61 (3d Cir. 1984) .............................. 16

**Page(s)**

*United Prod. Corp. v. Admiral Tool & Mfg. Co.*, 122 F. Supp. 2d 560
(E.D. Pa. 2000) ............................................................................................................... 15, 27

*Wedner v. Unemployment Board*, 296 A.2d 792 (Pa. 1972) ........................................................ 29

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ................................................ 9

**Statutes**

28 U.S.C. § 1334 ................................................................................................................. 9

**Rules**

Fed. R. Bankr. P. 7004 ......................................................................................................... 9

Fed. R. Bankr. P. 7004(f) ..................................................................................................... 9

Fed. R. Bankr. P. 7012(b) ..................................................................................................... 9

Fed. R. Civ. P. 4 ................................................................................................................. 9

Fed. R. Civ. P. 8 ................................................................................................................. 28

Fed. R. Civ. P. 8(a)(2) ......................................................................................................... 28

Fed. R. Civ. P. 9(b) ............................................................................................................. 28

Fed. R. Civ. P. 12(b)(2) ....................................................................................................... 9

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 28

Specially-appearing Defendants Grand River Ironsands Incorporated, North Atlantic Iron Corporation, Metalo Manufacturing Inc., and Francis MacKenzie (collectively, "Defendants") file this Brief in Support of their Motion to Dismiss Plaintiff's Complaint.

## I.    INTRODUCTION

Trustee brings this action against three Canadian corporations and a Canadian citizen. The Complaint contains no legal counts and does not otherwise articulate the legal or factual basis of Trustee's claims against any of the Defendants.  Instead, it reads like a run-on catalogue of legal conclusions seemingly designed to track the elements of a veil-piercing claim, which Trustee appears to assert against all of the Defendants.

The Complaint must be dismissed for two principal reasons.  First, this Court does not have personal jurisdiction over any of the defendants.  None of the Defendants has any meaningful connections to the United States whatsoever, and the handful of contacts that do exist (with respect to only two of the four defendants) are not related to the Trustee's claim.  Second and putting aside its jurisdictional deficiencies, the Complaint falls woefully short of articulating any facts that could even arguably support a veil-piercing claim (or any other claims) against any of the Defendants.  Accordingly, the Court should dismiss the Complaint in its entirety and with prejudice.

## II.    FACTUAL BACKGROUND

### A.    The Parties

#### 1.    *Metalo Manufacturing Incorporated*

Metalo Manufacturing Incorporated ("MMI") is a Canadian corporation that is traded publicly on the Canadian Securities Exchange (CSE: MMI).  The company was incorporated under the laws of the Province of Alberta, Canada, and has its headquarters in Toronto, Canada. (Decl. of Francis MacKenzie ¶ 9, June 13, 2019, attached as Exhibit 1; *see also* Metalo

Manufacturing Inc. Audited Cons. Fin. Stmts. for Year Ended June 30, 2018 at 5 ("2018 MMI

Fin. Stmts.), attached as Exhibit 2; Ex. 1, MacKenzie Decl. ¶ 69.)[1]  The company holds an equity

stake (directly and indirectly) in several companies that are engaged in the exploration and

development of iron ore throughout Canada and the development and construction of a

manufacturing plant to produce high purity pig iron for steel mills and foundries.  (Ex. 1,

MacKenzie Decl. ¶ 10.)  MMI is governed by an eight-member board of directors.  (*Id.*)

　　MMI has never conducted business, has never maintained any offices, has never held any

bank accounts and has never owned any property in the United States.  (*Id.* ¶ 11.)  The company

has never employed any individuals in the United States.  (*Id.* ¶ 12.)  MMI is not authorized to

conduct business in the United States.  (*Id.* ¶ 15.)  MMI does not have an agent authorized to

accept service in the United States.  (*Id.* ¶ 16.)

### 2.    *Grand River Ironsands Incorporated*

　　Grand River Ironsands Incorporated ("GRI") is a Canadian company incorporated under

the laws of the Province of Nova Scotia, Canada, and has its headquarters in Halifax, Canada.

(Ex. 1, MacKenzie Decl. ¶ 17.)  GRI is (indirectly) engaged in the exploration and development

of iron ore located in the iron sands of Labrador, Canada.  (*Id.* ¶ 18.)  GRI is governed by a six-

member board of directors.  (*Id.* ¶ 19.)  MMI has owned between 40% and 44% of GRI's stock

between 2012 and 2017.  (*Id.* ¶ 20.)  GRI owns 100% of the stock of Forks Specialty Metals,

Inc., the debtor herein.  (*Id.* ¶ 39.)

---

[1]　　For the sake of brevity and confidentiality, Defendants' exhibits are filed in partially
redacted and truncated form.  Complete, unredacted copies of all of the exhibits are available for
the Court's review.

GRI has never conducted business, has never maintained any offices,[2] has never held any bank accounts and has never owned any real property in the United States. (*Id.* ¶ 21.)  The company does not have any U.S.-based employees. (*Id.* ¶ 24.)  GRI is not authorized to conduct business in the United States. (*Id.* ¶ 25.)  GRI does not have an agent authorized to accept service in the United States. (*Id.* ¶ 26.)  Other than its ownership interest in Forks Specialty Metals, Inc., GRI has not entered into any contractual or business relationships in the United States. (*Id.* ¶ 22.)

### 3.   *North Atlantic Iron Corporation*

North Atlantic Iron Corporation ("NAIC") is a Canadian company incorporated under the laws of the Province of Newfoundland and Labrador, Canada, with its headquarters in Bedford, Nova Scotia, Canada. (Ex. 1, MacKenzie Decl. ¶ 28.)  NAIC was a joint venture between GRI and Petmin Limited, a South African publicly traded corporation, between 2012 and 2017. (*Id.* ¶ 29.)  GRI's ownership stake in NAIC was approximately 60% during the period between 2012 and 2017. (*Id.* ¶ 30.)  NAIC was governed by a five-member board of directors between 2012 and 2017.[3] (*Id.* ¶ 31.)

NAIC is engaged in the exploration and development of mineral sands and holds mineral mining rights to property located in Labrador, Canada. (*Id.* ¶ 32.)  The company has never maintained any offices, has never held any bank accounts and has never owned any property in the United States. (*Id.* ¶ 33.)  The company has never employed any individuals in the United

---

[2]     For several years, the company's vice president, Kevin Kemper, maintained a home office in New York state.  But Mr. Kemper never used his personal office to conduct any business on GRI's behalf in the United States. (Ex. 1, MacKenzie Decl. ¶ 23.)  Mr. Kemper is a consultant (i.e., independent contractor) to GRI. (*Id.*)

[3]     After the relevant time frame, GRI and Petmin Limited restructured their joint ownership of NAIC such that GRI currently owns 90% of NAIC, and NAIC's affairs are now governed by a three-member board of directors. (*Id.* ¶ 30.)

States.[4]  (*Id.* ¶ 34.)  NAIC was party to a third-party smelting arrangement with FSM during the period between 2012 and 2017.  (*Id.* ¶ 35.)  That relationship aside, NAIC has not solicited or conducted any business in the United States.  (*Id.*)  NAIC does not have an agent authorized to accept service in the United States.  (*Id.* ¶ 34.)

### 4.    Francis MacKenzie

Francis MacKenzie is a Canadian citizen who resides in the town of Bedford, the Province of Nova Scotia, Canada.  (Ex. 1, MacKenzie Decl. ¶ 3.)  He is the president and a board member of each of MMI, GRI and NAIC.  (*Id.* ¶ 4.)  He was also president and a board member of FSM between 2012 and 2017.  (*Id.* ¶ 5.)  Mr. MacKenzie is the only common director on the boards of MMI, GRI, NAIC and FSM.[5]  (*Id.*)  He has not resided, owned real property, maintained any bank accounts or had any personal dealings in the United States during at least the past 35 years.  (*Id.* ¶ 8.)

### 5.    Forks Specialty Metals Incorporated

Debtor Forks Specialty Metals, Inc. ("FSM") is a Pennsylvania corporation with its principal (and only) place of business located at 3700 Glover Road, Easton, Pennsylvania 18040. (Compl. ¶ 7, Feb. 8, 2019 (ECF 1); Ex. 1, MacKenzie Decl. ¶ 38.)  FSM is a wholly owned subsidiary of GRI.  (*Id.* ¶ 39.)  The company was formed in November of 2012.  (*Id.*; Compl. ¶ 7.)

---

[4]     Mr. Kemper does serve as NAIC's vice president.  (*Id.* ¶ 34.)

[5]     By way of additional background, Mr. MacKenzie has a long history of political and public service and involvement in Nova Scotia.  He held leadership roles on several economic development partnership organizations in Nova Scotia until the early 2000s, when he was elected as the leader of the Nova Scotia Liberal Party – a role he held until 2006.  (Ex. 1, MacKenzie Decl. ¶ 6.)  He became president and a director of GRI in 2007.  (*Id.* ¶ 6.)  He joined MMI and NAIC in 2012.  (*Id.* ¶ 7.)

FSM's initial business objectives were two-fold:  to attempt to (i) produce ferromanganese,[6] and (ii) function as a contract smelting facility for third-party producers of iron ore, steel, specialty alloys and other recycled materials.  (*See* Forks Specialty Metals, Inc. Business Summary at 3, Jan. 23, 2013 (the "2013 FSM Business Summary"), attached as Ex. C to Compl. (ECF 1-3)); *see also* Ex. 1, MacKenzie Decl. ¶ 40.)  FSM conducted its operations from a single 181,000 square-foot manufacturing facility located in Easton, Pennsylvania, which it occupied pursuant to a long-term lease that the company signed in 2012 with an unrelated third-party entity.  (2013 FSM Business Summary at 16; *see also* Ex. 1, MacKenzie Decl. ¶ 41.)

To support its operations, FSM acquired two submerged arc furnaces ("SAFs") from the Pennsylvania Department of Community and Economic Development ("PADCED").  (*Id.* ¶ 42.) The company purchased the SAFs from PADCED for $1.6 million, the entirety of which was financed pursuant to a promissory note issued by PADCED to FSM.  (*Id.*)  That transaction is memorialized in a Bill of Sale signed by PADCED and an accompanying Note signed by FSM.[7] (*See* Ex. B to Compl. at 5-6, 14-18 (ECF 1-2).)  None of the Defendants signed any guarantees or other documents in connection with FSM's real-estate lease or SAF purchases.  (Ex. 1, MacKenzie Decl. ¶ 42.)

From FSM's inception, Mr. MacKenzie served as the company's president.  (*Id.* ¶ 44.) Kevin Kemper was the company's vice president and secretary.[8]  (*Id.*)  Messrs. MacKenzie and Kemper served as the company's two directors.  (*Id.* ¶ 45.)  They regularly held board meetings

---

[6]    Ferromanganese is a manganese alloy produced by heating manganese ore with coal in a furnace.

[7]    As the Bill of Sale provides, the SAFs were repossessed by PADCED after their former owner, RSI Silicon Products, LLC, defaulted on a loan agreement between PADCED and that entity.  (*See* Ex. B to Compl. at 5 (ECF 1-2).)  RSI Silicon Products, LLC was the previous tenant of FSM's facility.

[8]    In 2015, FSM appointed a third officer, Lina Tannous.  (Ex. 1, MacKenzie Decl. ¶ 44.)

and passed resolutions, records of which were maintained by FSM.  (*Id.* ¶ 45; *see also* Minutes

of Mtgs. and Resolutions of FSM, attached as Exhibit 3.)  Mr. Kemper is not and has never been

a director of MMI, NAIC or GRI.  (Ex. 1, MacKenzie Decl. ¶ 46.)

FSM's principal (and, ultimately, only) employees were two industry experts, whom

FSM hired to manage and run the company's day-to-day operations:  William O'Connor and

Christopher McKinney.  (*Id.* ¶ 47.)  Mr. McKinney was the company's general manager;

Mr. O'Connor led the company's process development efforts.  (*Id.* ¶ 48.)  Both Mr. McKinney

and Mr. O'Connor have extensive experience and knowledge in the installation, commissioning

and operation of arc furnaces.  (*Id.* ¶ 49.)  They managed the company's operations from the

company's facility in Easton, Pennsylvania.  (*Id.*)  Neither Mr. O'Connor nor Mr. McKinney

were employed by or otherwise provided any services to MMI, NAIC or GRI during FSM's

operations.  (*Id.* ¶ 50.)  In turn, no employees of MMI, GRI or NAIC were employed by FSM.

(*Id.* ¶ 51)  FSM paid wages and provided other fringe benefits to Mr. O'Connor and

Mr. McKinney until the company's bankruptcy.  (*Id.* ¶ 52.)

FSM anticipated two principal sources of revenue:  third-party contract smelting

operations and the production of ferromanganese.  (*See* 2013 FSM Business Summary at 7-8

(ECF 1-3); *see also* Ex. 1, MacKenzie Decl. ¶ 53.)  Although FSM acquired all of the equipment

required to undertake those operations, the company intended to raise an additional $6 million to

support future expansion efforts through the sale of up to a 70% equity stake in the company to a

third party.  (2013 FSM Summary at 3-4, 22; Ex. 1, MacKenzie Decl. ¶ 53.)

From the company's inception, FSM secured a stable revenue stream in the form of a

smelt-test arrangement with NAIC.  (*Id.* ¶ 54.)  During the company's five-year existence, FSM

generated approximately $5.14 million in revenue from that arrangement.  (*Id.*)  During that

period, FSM also performed third-party smelting services for other companies, albeit on a more

limited, cost recovery basis.  (*Id.*)

    With its third-party smelting operations underway, Messrs. O'Connor and McKinney

undertook extensive efforts on FSM's behalf to identify and form agreements with other

companies and to identify potential customers for the company's ferromanganese production

operations.  (*Id.* ¶ 55.)  The company made numerous proposals and pursued extensive

discussions with multiple potential partners.  (*Id.* ¶ 56.)  Messrs. O'Connor and McKinney

provided regular updates on their efforts to Messrs. Kemper and MacKenzie in their roles as

FSM's directors and officers.  (*Id.* ¶ 57.)  Importantly, FSM was responsible for managing its

own operations, and no employee or other representative of MMI, GRI or NAIC had any

managerial input or control with respect to FSM's operations.  (*Id.* ¶ 58.)  FSM ultimately

determined that the SAFs were not capable of producing the required grade of ferromanganese.

(*Id.* ¶ 59.)

    As part of those efforts, the company further refined its business strategy to attempt to

capitalize on opportunities in the recovery of precious metals from electronic scrap ("e-scrap")

and the recovery of platinum metals from autocatalysts.  (*Id.* ¶ 60.)  The company discussed with

several companies an arrangement whereby that company would provide an equity stake in FSM

in exchange for capital investment and a supply of materials for use in FSM's e-scrap operations.

(*Id.*)

    None of MMI, GRI or NAIC has ever been engaged in the production of ferromanganese,

nor has any of them ever conducted operations as a third-party smelting facility.  (*Id.* ¶ 61.)

None of those entities were ever engaged in the recovery of precious metals from e-scrap or the

recovery of platinum metals from autocatalysts.  (*Id.*)  MMI, GRI and NAIC did not even operate

any smelting facilities or furnaces between 2012 and 2017.  (*Id.*)  In turn, FSM was never

involved in the exploration, extraction, processing or manufacture of pig iron.  (*Id.*)

Throughout the course of its operations, FSM maintained separate internal accounting

and financial records.  (*Id.* ¶ 63; *see also, e.g.*, FSM Financial Statements for Years 2013-2017,

attached as Exhibit 4.)  Shortly after it commenced operations, the company opened its own bank

account.  (*Id.* ¶ 64; *see also, e.g.*, FSM Bank Account Statements for July 2014, 2015, and 2016,

attached as Exhibit 5.)  FSM filed its own tax returns and maintained a full portfolio of its own

insurance policies (including workers compensation coverage, automobile coverage, pollution

coverage, and general commercial coverage, among others).  (*Id.* ¶ 65; *see also* FSM Tax Return

excerpts for 2012, 2014, 2015 and 2017, attached as Exhibit 6.)  In short, FSM maintained stable

operations – and paid all of its bills as they became due.  (*See generally* Ex. 4, FSM Financial

Statements for Years 2013-2017.)

Despite its extensive efforts, FSM was ultimately unsuccessful in finding a market or a

strategic partner for its e-scrap operations.  (Ex. 1, Mackenzie Decl. ¶ 66.)  Its effort to

manufacture ferromanganese also fell short.  (*Id.*)  The company fell behind on its lease

payments on its facility and on its loan with PADCED.  (*Id.* ¶ 67.)  In the spring of 2017, FSM's

landlord confessed judgment against FSM.  (*Id.*)  In December of 2017 – i.e., five years after it

began operations – the company filed for bankruptcy protection under Chapter 7 of the U.S.

Bankruptcy Code.  (Compl. ¶ 5.)

**B.      The Trustee's Claim**

The Trustee commenced this adversary proceeding by filing a Complaint against MMI,

GRI, NAIC and Mr. MacKenzie on February 8, 2019.  (ECF 1.)  The Trustee's 107-paragraph

Complaint contains no legal counts and does not articulate the legal basis of any particular

claims with respect to any of the defendants.  In general terms, however, it appears that the

Trustee principally contends that this Court should "disregard" and "pierce" the corporate forms

of MMI, GRI and NAIC and enter a judgment in Trustee's favor against all four defendants for

the full amount of the claims of the bankruptcy estate (among other relief).  (*See generally*

Compl. at WHEREFORE Clause (ECF 1).)

### III.    LEGAL ARGUMENT

**A.    This Court Lacks Personal Jurisdiction Over the Defendants.**

The Court should dismiss the Complaint in its entirety because the Court lacks personal

jurisdiction over any of the Defendants.

#### 1.    *Legal Standard*

As the Supreme Court explained long ago, the Due Process Clause "does not contemplate

that a state may make binding a judgment *in personam* against an individual or corporate

defendant with which the state has no contacts, ties, or relations." *Int'l Shoe Co. v. Washington*,

326 U.S. 310, 319 (1945) (citations omitted).  Through those fundamental protections, the

Constitution "gives a degree of predictability to the legal system that allows potential defendants

to structure their primary conduct with some minimum assurance as to where that conduct will

and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.

286, 297 (1980).

The defendants first move to dismiss the Complaint for lack of personal jurisdiction

under Rule 12(b)(2), made applicable to adversary proceedings by Fed. R. Bankr. P. 7012(b).

Pursuant to Fed. R. Bankr. P. 7004(f), three requirements must be met for the Court to exercise

personal jurisdiction over each defendant: (1) service of process must have been made in

compliance with Fed. R. Bankr. P. 7004 or Fed. R. Civ. P. 4; (2) the Court must possess subject

matter jurisdiction pursuant to 28 U.S.C. § 1334; and (3) the exercise of jurisdiction must be

consistent with the Constitution and laws of the United States.  *In re Flabeg Solar US Corp.*, 561

B.R. 364, 368 (Bankr. W.D. Pa. 2016) (citation omitted).  As set forth more fully below, the third requirement has not – and cannot – be satisfied here.

To satisfy constitutional due process, each Defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (citations and internal marks omitted).  "In proceedings arising in or related to a case under the Bankruptcy Code, personal jurisdiction is assessed based upon a defendant's contacts with the United States as a whole, as opposed to a particular state." *In re Flabeg Solar US Corp.*, 561 B.R. at 368-69 (citing cases); *see also In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir. 1997) (same).

In evaluating a personal jurisdictional motion, the Court employs a burden-shifting analysis.  In particular, "[w]hen a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank (East) PSFS, N.A. v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (citation omitted).  In that respect, "the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Carteret Savings Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992) (citations omitted).  The plaintiff "may not rely on [its] bare pleadings" and must instead counter defendant's affidavits with contrary evidence. *Lionti v. Dipna, Inc.*, Civ. No. 17-1678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (internal marks omitted) (*quoting Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66, n.9 (3d Cir. 1984)).  In other words, the plaintiff "must respond to the defendant's motion with 'actual proofs'; 'affidavits which parrot and do no more than restate [the] plaintiff's allegations . . . do not end the inquiry.'" *Id.*

Federal courts recognize two types of personal jurisdiction: "General jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state. Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at the forum state." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (*citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & nn.8-9 (1984)); *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008) (same). In each instance, "[a] nexus between the defendant, the forum and the litigation is the essential foundation of *in personam* jurisdiction." *Gen. Electric Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). As discussed more fully below, neither type of personal jurisdiction exists here.

### 2.    *This Court Does Not Have General Jurisdiction Over Any of the Defendants.*

As the Supreme Court explained recently, general jurisdiction over a foreign corporation typically arises only when that corporation's "affiliations with the [forum] are so continuous and systematic as to render [it] essentially at home in the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citation and internal marks omitted). "[A] corporation is generally 'at home' in its 'place of incorporation and principal place of business.'" *Chavez v. Dole Food Company*, Inc., 836 F.3d 205, 223 (3d Cir. 2016) (*quoting Daimler AG*, 571 U.S. at 137.) Applying those principles, the Third Circuit recently observed that it is "incredibly difficult to establish general jurisdiction [over a corporation] in a forum *other* than the place of incorporation or principal place of business." *Id.* (*quoting Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)).

Here, there is no general personal jurisdiction against any of the Defendants. Specifically, neither MMI, GRI nor NAIC was incorporated anywhere in the United States, none of them maintains an office in this country, and none of them conducts any continuous or systematic business activities here. Accordingly, none of those entities is subject to general

11

personal jurisdiction in this Court. *See, e.g.*, *Chavez*, 836 F.3d at 223 (no general jurisdiction against foreign company that "is not incorporated there, does not maintain an office there, and does not supervise its business there").

In a similar vein, Ms. MacKenzie does not reside anywhere in the United States. Accordingly, the Court also lacks general personal jurisdiction against him. *See, e.g.*, *Koch v. Pechota*, 744 F. App'x 105, 110 (3d Cir. 2018) ("[A]n individual is 'at home' where they are domiciled – in other words, an individual's 'true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'" (*quoting McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006))).

### 3.    *This Court Does Not Have Specific Jurisdiction Over Any of the Defendants.*

"Determining whether specific jurisdiction exists involves a three-part inquiry." *Kehm Oil Co.*, 537 F.3d at 300 (*citing O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007)). "First, the defendant must have 'purposefully directed his activities' at the forum." *Id.* (*quoting Burger King*, 471 U.S. at 472). Next, "the plaintiff's claim must 'arise out of or relate to' at least one of those specific activities." *Id.* (*quoting Helicopteros*, 466 U.S. at 414); *see also Deutz AG*, 270 F.3d at 150 ("Questions of specific jurisdiction are properly tied to the particular claims asserted."). Finally, the Court "may consider additional factors to ensure that the assertion of jurisdiction otherwise 'comport[s] with fair play and substantial justice.'" *Kehm Oil Co.*, 537 F.3d at 300 (*quoting Burger King*, 471 U.S. at 476). Importantly, the third prong of the Court's inquiry bears added significance where, as here, the out-of-state defendant is a resident of a foreign country. *See, e.g.*, *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

12

(a)    **MMI**

MMI has not directed or otherwise undertaken any activities whatsoever in the United

States.  (Ex. 1, MacKenzie Decl. ¶ 14.)  More specifically, MMI has not entered into any

contractual or other business relationships in the United States.  (*Id.* ¶ 13.)  No representative of

MMI has made any representations, solicited any business or otherwise sought to establish a

business presence in the United States on MMI's behalf.  (*Id.*)  Nor has any MMI representative

had any involvement with FSM's formation or operations on MMI's behalf.  (*see id.* ¶¶ 13-14.)

Mr. MacKenzie did not conduct any activities in or targeted towards the United States in his

capacity as MMI's president, board member or representative.  (*Id.* ¶ 14.)  As a consequence,

there are simply no claims in the Complaint (nor could there be) that could hypothetically arise

out of or relate to any of MMI's (non-existent) activities in the United States.  Accordingly, it

would be entirely unfair, unreasonable and unconstitutional for this Court to exercise personal

jurisdiction over MMI.

In fact, MMI's sole so-called "connection" to this dispute is its minority (i.e., 44%)

ownership stake in GRI, another Canadian entity, which owns FSM.  It is well established,

however, that a foreign defendant's ownership of a subsidiary corporation in the forum state does

not subject the foreign defendant to personal jurisdiction in the forum – even where the

subsidiary is *wholly owned* by the defendant.[9]  *See, e.g.*, *Kehm Oil Co.*, 537 F.3d at 301 ("The

---

[9]      The Trustee may also point to the fact that Mr. MacKenzie, who is MMI's president and
board member, is also FSM's board member and president.  But the fact that an individual is
employed by two separate corporate entities, one of which is subject to personal jurisdiction in
this forum, does not confer personal jurisdiction in this Court over the foreign entity having no
connection to this forum.  In particular, "a corporation can act only though its officers,
employees, and other agents."  *Carmen Enters., Inc. v. Murpenter, LLC*, 185 A.3d 380, 391 n.15
(Pa. Super. Ct. 2018) (citation omitted).  Because personal jurisdiction must be premised on
specific activities that "arise out of or relate to" the plaintiff's claim, and because
Mr. MacKenzie engaged in no activities in or directed at the United States on MMI's behalf, his

mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, *even if the parent is sole owner of the subsidiary*." (emphasis added) (citation omitted)).  MMI's connection is yet another step removed from that scenario, because it does not own FSM and only holds a minority stake in GRI.  Accordingly, the Court lacks specific jurisdiction over MMI.

### (b)    GRI

For largely the same reasons as those applicable to MMI, the Court does not have specific personal jurisdiction over GRI.  Specifically, GRI's sole connection to the forum – and to this action – is its ownership of FSM.  As discussed above, however, GRI's ownership of FSM – even sole ownership – does not subject GRI to specific jurisdiction in this state.  *See Kehm Oil Co.*, 537 F.3d at 301.

Putting aside its ownership interest in FSM, GRI has not directed or undertaken any other activities whatsoever in the United States.  (Ex. 1, MacKenzie Decl. ¶¶ 21-22, 24-26.)  GRI has not entered into any contractual or business relationships in the United States.  (*Id.* ¶ 22.) Mr. MacKenzie did not conduct any activities in or targeted towards the United States in his capacity as GRI's president, board member or representative relating to the management or operations of FSM.  (*Id.* ¶ 27.)  And, there are no substantive claims asserted by the Trustee that arise out of or relate to any of GRI's activities in the United States (except for GRI's ownership of FSM).  Accordingly, the Court cannot exercise personal jurisdiction over GRI either.

---

activities in this forum on FSM's behalf do not – and cannot – subject MMI to jurisdiction in this Court.

### (c)    NAIC

The Trustee fares equally poorly with respect to NAIC.  As discussed above, NAIC is

Canadian corporation partially owned by GRI.  (*See* Ex. 1, MacKenzie Decl. ¶¶ 28-30.)  NAIC's

sole connection to the United States (and FSM) was its third-party smelting arrangement with

FSM.  (*Id.* ¶ 35.)  But that arrangement had nothing to do with any aspect of the Trustee's

Complaint because the Trustee does not allege that NAIC violated any aspect of that

arrangement.

Putting aside its contract with FSM, NAIC has not directed or otherwise undertaken any

activities whatsoever in the United States.  (*Id.* ¶¶ 33-35.)  NAIC does not hold an ownership

stake in FSM.  NAIC has no other contractual or business relationships in the United States.  (*Id.*

¶ 35.)  NAIC has not made any representations and has not solicited any other business in the

United States.  (*Id.*)  NAIC has never had any involvement with FSM's formation or operations.

(*Id.* ¶ 36.)  Mr. MacKenzie did not conduct any activities in or relating to the United States in his

capacity as NAIC's president or board member.  (*Id.* ¶ 37.)  Accordingly, the Court cannot

exercise personal jurisdiction over NAIC.

### (d)    Mr. MacKenzie

Lastly, Mr. MacKenzie has no connection to – and has not undertaken any activities in –

the United States (during at least the past 35 years), except for those he undertook solely in his

capacity as FSM's president and board member.  (*See* Ex. 1, MacKenzie Decl. ¶¶ 4-8, 14, 21, 27,

37, 44.)  The law is clear that "a court does not have personal jurisdiction over an individual

defendant whose only contacts with the forum state were taken in his or her corporate capacity."

*United Prod. Corp. v. Admiral Tool & Mfg. Co.*, 122 F. Supp. 2d 560, 562 (E.D. Pa. 2000)

(collecting cases); *accord in Re Commodore Int'l, Ltd.*, 242 B.R. 243, 252 (Bankr. S.D.N.Y.

1999) ("[A]n officer's presence in New York to conduct business for the [c]orporation does not

give us jurisdiction over the person individually." (citing cases)).  Accordingly, the Court does not have personal jurisdiction over Mr. MacKenzie either.

### 4.      The Trustee's Theory of Jurisdiction is Meritless.

Likely aware that none of the Defendants has the requisite minimum contacts with the forum, the Complaint attempts to fabricate an "alter ego" jurisdictional predicate by reciting a series of bald legal conclusions and pointing to a handful of isolated, out-of-context statements from several documents.  A plain reading of the Complaint and the materials referenced by the Trustee makes clear that those contentions have no factual or legal merit.

### (a)      MMI, GRI and NAIC

The Complaint contains conclusory allegations seemingly intended to invoke the "alter ego" theory of personal jurisdiction against MMI, GRI and NAIC.  Pursuant to that theory, a foreign corporation may be subject to personal jurisdiction in the forum state if its domestic subsidiary is essentially acting as an "alter ego" of the foreign parent.  *See, e.g.*, *Savin Corp. v. Heritage Copy Prods., Inc.*, 661 F. Supp. 463, 468-69 (M.D. Pa. 1987).  It is important to note, however, that the "alter ego" theory of jurisdiction applies in very narrow circumstances and is exceedingly difficult to establish.  *See Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1098, 1104 (W.D. Pa. 1980) ("[E]stablishing an 'alter ego' relationship between parent and subsidiary for jurisdictional purposes is not an easy task."), *aff'd*, 752 F.2d 891 (3d Cir. 1985).

The Third Circuit has explained the high burden faced by a plaintiff seeking to invoke alter ego jurisdiction:

> [W]here the corporate separation between a parent and subsidiary, "though perhaps merely formal," is "real" and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise.

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir.

1972) (*quoting Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925)).  To that end,

> if the subsidiary's presence in the state is primarily for the purpose of carrying on
> its own business and the subsidiary has preserved some semblance of
> independence from the parent and is not acting as merely one of its departments,
> personal jurisdiction over the parent corporation may not be acquired simply on
> the basis of the local activities of the subsidiary company.

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277,

317 (W.D. Pa. 2010) (citation omitted), *aff'd*, 683 F.3d 462 (3d Cir. 2012).

The Supreme Court's jurisprudence mandates such a high bar.  Specifically, the Court

explained nearly 100 years ago that a foreign corporation's sole ownership of a domestic

subsidiary – and the characteristics normally appurtenant to such ownership – cannot form the

basis of alter-ego personal jurisdiction:

> Through ownership of the entire capital stock and otherwise, the defendant
> dominates the [domestic] corporation, immediately and completely; and exerts its
> control both commercially and financially in substantially the same way, and
> mainly through the same individuals, as it does over those selling branches or
> departments of its business not separately incorporated which are established to
> market the [defendant's] products in other States. The existence of the [domestic]
> company as a distinct corporate entity is, however, in all respects observed. Its
> books are kept separate. All transactions between the two corporations are
> represented by appropriate entries in their respective books in the same way as if
> the two were wholly independent corporations. This corporate separation from the
> general [defendant] business was doubtless adopted solely to secure to the
> defendant some advantage under the local laws.

*Cudahy Packing Co.*, 267 U.S. at 335.

In determining whether a domestic subsidiary is the alter ego of its foreign parent, courts

consider the following factors:

> (1) ownership of all or most of the stock of the subsidiary; (2) common officers
> and directors; (3) a common marketing image; (4) common use of a trademark or
> logo; (5) common use of employees; (6) an integrated sales system;
> (7) interchange of managerial and supervisory personnel; (8) performance of
> business functions by the subsidiary which the principal corporation would

normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation.

*Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005) (citations omitted). "No single factor is dispositive, and the court may consider all relevant evidence to determine whether the parent exercises actual control over a subsidiary beyond that which is characteristic of a usual parent-subsidiary relationship." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 570 (M.D. Pa. 2009) (citations omitted); *accord Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830, 837 (E.D. Pa. 1997) ("[T]his Court believes that it should examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary to assess whether the contacts of the subsidiary with a particular state should be imputed to the parent.").

The Complaint fails to allege *any facts* that would permit this Court to exercise alter ego jurisdiction over MMI, GRI or NAIC, and the Complaint's scant allegations are otherwise inaccurate. In particular, the Complaint includes a laundry list of conclusory statements intended to track the elements of an alter ego claim – i.e., that Defendants—

    (i)     "controlled" Forks, (Compl. ¶¶ 13, 16, 23, 43, 44);

    (ii)    "all have interlocking officers and directors," (*id.* ¶ 34);

    (iii)   are "all involved in the same line of business" as FSM, (*id.* ¶ 35);

    (iv)    treated FSM's assets as their own, (*id.* ¶ 42),

    (v)     treated FSM as a "division" of their business, (*id.* ¶ 38),

    (vi)    have "unified administrative control," (*id.* ¶ 43(b)),

    (vii)   failed to "adequately fund" FSM, (*id.* ¶ 26), and

(viii)   induced "creditors" to rely upon their "representations" that FSM was a "division" of their business and "not a separate corporate entity," (*id.* ¶¶ 42, 47).

The Complaint's only additional detail consists of several phrases that the Complaint purports to quote from several documents attached to the Complaint.  (*See generally* Exs. C-G to Compl. (ECF 1-3 to -7).)  Nothing in those documents – and nothing in the Complaint as a whole – supports the Trustee's argument.

*First*, there are no *facts* in the Complaint to support Trustee's conclusion that MMI, GRI or NAIC "controlled" FSM.  To be sure, GRI owns 100% of FSM's stock.  As discussed above, however, "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary."  *Kehm Oil Co.*, 537 F.3d at 301.  Moreover, "[c]ontrol of a subsidiary is not sufficient, in and of itself, to establish an alter-ego relationship."  *Savin,* 661 F. Supp. at 469 (citation omitted).  Rather, the plaintiff must establish that "the degree of control exercised by the parent [is] greater than normally associated with common ownership and directorship" and that "the parent controls the day-to-day affairs of the subsidiary, such that the subsidiary is merely a department of the parent."  *Id.* (citations omitted); *accord Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2005) (citations omitted).  The Complaint alleges no such facts.

Further, the Complaint's allegation that "Defendants" "negotiated" or "executed" the Bill of Sale pursuant to which FSM purchased the two SAFs, (Compl. ¶¶ 9, 30), is precluded by the very documents the Complaint cites in support of that allegation.  Specifically, Exhibits A and B to the Complaint make clear that the transaction at issue was formed solely between PADCED and FSM, and Mr. MacKenzie executed the Note solely in his capacity as FSM's president.  (*See* Ex. A to Compl. at 2 (ECF 1-1) & Ex. B to Compl. at 14, 18 (ECF 1-2).)  There is nothing in

those documents – nor are there any *facts* in the Complaint – to support the conclusion that MMI,

GRI, NAIC (or Mr. MacKenzie in his individual capacity) controlled or otherwise consummated

that transaction.  Importantly, none of the Defendants signed a guaranty or any other

documentation in connection with FSM's purchase of the SAFs (or any other transactions

undertaken by FSM).  (Ex. 1, MacKenzie Decl. ¶ 43.)

*Second*, the Complaint's conclusory statement that MMI, GRI, NAIC and FSM "all have

interlocking officers and directors" is factually inaccurate.  The fact of the matter is that

Mr. MacKenzie is the *only* common director among those entities.  (*See supra* p. 4.)

Messrs. MacKenzie and Kemper do have officer positions with each of the defendant entities and

FSM, but the other officers of those corporations have no involvement or role whatsoever with

FSM.  (*See* Ex. 1, MacKenzie Decl. ¶¶ 45, 47, 50, 51.)

*Third*, MMI, GRI, NAIC and FSM are *not* involved in the same line of business.  Again,

none of MMI, GRI or NAIC has ever been engaged in the production of ferromanganese, none of

them has extracted precious metals from e-scrap, and none of them has ever conducted

operations as a third-party smelting facility.  (*See supra* pp. 7-8.)  Indeed, MMI, GRI and NAIC

did not even operate any smelting facilities or furnaces between 2012 and 2017.  (*Id.*)  FSM, in

turn, was never involved in the exploration, extraction, processing or manufacture of pig iron.

(*Id.*)  In that respect, it is also important to note that FSM does not share any marketing materials

(or logos) with MMI, GRI or NAIC.  (Ex. 1, MacKenzie Decl. ¶ 62; *see also* Corporate Logos of

FSM, MMI, GRI and NAIC, attached as Exhibit 7.)

*Fourth*, none of MMI, GRI and NAIC has never "treated" FSM as its "division," nor has

it treated FSM's assets as its own.  (Ex. 1, MacKenzie Decl. ¶ 68.)  The Complaint's factual

support for those contentions – i.e., a handful of isolated quotes strung together from several

unrelated documents – does not permit a conclusion to the contrary.  Specifically, Exhibit C to

Trustee's Complaint is not "marketing material," nor does it reflect "representations" made by

Defendants that "they were committed to provide the needed financing for the Debtor."  (Compl.

¶ 16.)  Rather, Exhibit C to the Complaint is an FSM business overview document prepared by

FSM in 2013 solely for internal use.  (Ex. 1, MacKenzie Decl. ¶ 70.)  No copies of that document

were provided to the PACDED or any other entity in the United States.  (*Id.*)  More

fundamentally, the document as a whole plainly describes, in granular detail, FSM's own,

independent business plan and strategy and makes clear that FSM intended to conduct profitable

operations on a long-term basis.  (*See generally* Ex. C to Compl. (ECF 1-3).)  GRI's role in

founding FSM and providing it with capital to commence its operations is "no more than what

would be expected" from any sole owner of such an entity.  As such, that document actually

precludes the Trustee's contention that FSM is the "alter ego" of any of the other corporate

defendants.

The Complaint also points to Exhibit D to the Complaint, which is a letter sent by GRI to

a third party in 2015, as support for the conclusion that "GRI entered into transactions utilizing

assets of the Debtor as if they were GRI assets."  (Compl. ¶ 17.)  The Trustee's contention is

precluded by a plain reading of the letter itself.  Specifically, Exhibit D is a (non-binding) letter

of intent sent by GRI to Elemental Recycling, LLC, a third-party entity, reflecting GRI's

discussions regarding the contribution of its 100% ownership stake in FSM (as it is indisputably

entitled to do) toward a new joint venture for the purpose of e-scrap smelting and precious metal

recycling.  (Ex. D to Compl. at 1 (ECF 1-4).)

The potential transaction reflected in Exhibit D was never consummated.  (Ex. 1,

MacKenzie Decl. ¶¶ 71-72.)  The letter itself was never distributed to anyone other than its

intended recipient.  (*Id.* ¶ 72.)  Elemental Recycling, LLC ultimately did not enter into any

business dealings or relationships with FSM or GRI, (*id.*), and Elemental Recycling, LLC is not

a creditor in this bankruptcy.  In short, nothing in Exhibit D reflects any effort by GRI to "utilize

FSM's assets as its own" or to exercise any level of control beyond that which is customary for

an owner of a company's equity.

The Complaint next points to what it terms an "investment teaser" dated January 2017,

attached as Exhibit E to the Complaint, as support for the contention that "GRI and NAIC

marketed [FSM's] assets as if [FSM's] assets belonged to them."  (Compl. ¶ 18 & Ex. E to

Compl. (ECF 1-5).)  That document does not support the Trustee's contention either.

Specifically, the document attached as Exhibit E to the Complaint was used by FSM in

connection with its effort to solicit strategic partners for its business.  (Ex. 1, MacKenzie Decl.

¶ 73.)  That document describes a prospective business relationship that FSM was pursuing as of

early January 2017, and it otherwise sets forth FSM's plans to extract precious metals from

automotive catalytic converters.  (*Id.*)  FSM was ultimately unable to attract any such partners,

and the prospective business relationship reflected in that document did not materialize.  (*Id.*)

The *only* references in the document to GRI or NAIC are in the "Background" section, wherein

FSM describes its origins (i.e., as a wholly owned subsidiary of GRI) and its business

relationship with NAIC (i.e., as a third-party smelting facility, pursuant to a separate

arrangement).  (Ex. E to Compl. at 2 (ECF 1-5).)  Those references in no way support Trustee's

alter ego jurisdiction claim.

The Complaint next proclaims that "Defendants" "so dominated" FSM that they excluded

FSM from a non-disclosure agreement between GRI, NAIC and WoodsWater Capital, Inc.

relating to that entity's potential purchase of GRI's stake in FSM  (Compl. ¶ 19.)  In that

instance, the Complaint curiously omits any supporting documentation.  That contention is

factually inaccurate, however.  Specifically, FSM entered into exclusive discussions with

WoodsWater Capital, Inc. in 2014 regarding a potential transaction whereby WoodsWater

Capital, Inc. would make an equity investment in FSM's business.  (Ex. 1, MacKenzie Decl.

¶ 69(i).)  In connection with those discussions, *FSM and WoodsWater Capital, Inc.* signed an

Exclusivity Agreement on July 21, 2014 to allow WoodsWater Capital, Inc. to complete a review

of FSM's business.  (*See* Exclusivity Agreement between FSM and WoodsWater Capital, Inc.,

July 21, 2014, attached as Exhibit 8.)  Kevin Kemper signed that document on FSM's behalf.

(*Id.* at 2.)  Neither GRI nor NAIC were parties to that agreement.[10]

The Complaint next references a statement contained in the "About Metalo

Manufacturing Inc." section of MMI's notice of special shareholders' meeting dated December

5, 2017, attached as Exhibit F to the Complaint, which reads, "FSM is currently used as a testing

facility for iron smelting."  (Compl. ¶ 39 & Ex. F to Compl. (ECF 1-6).)  Once again, the quoted

statement in no way supports the Trustee's alter ego theory of jurisdiction.

Lastly, the Complaint references a single slide from a larger PowerPoint presentation

made by MMI to its shareholders in 2015.  (Compl. ¶ 40 & Ex. G (ECF 1-7).)  That slide does

not support the Complaint's contention that MMI reported to its shareholders in 2015 that it

"owned" FSM's facility.  Rather, the slide is simply a reference to the feasibility tests then being

conducted by FSM for NAIC, which were being performed by FSM pursuant to the separate

---

[10]      The non-disclosure agreement referenced by the Complaint was an entirely separate
agreement signed among WoodsWater Capital, Inc., GRI and NAIC to ensure that WoodsWater
Capital, Inc. maintained the confidentiality of any non-public documents it obtained *regarding
those entities* during its due diligence process.  (*See* Non-Disclosure and Confidentiality
Agreement among GRI, NAIC and WoodsWater Capital, Inc., July 21, 2014, attached as Exhibit
9.)  It is entirely disingenuous for the Trustee to suggest that FSM should have been a party to, or
was otherwise "excluded" from that agreement, let alone that its exclusion was the result of
GRI's or NAIC's "domination" of FSM.

arrangement between those parties – an arrangement that generated revenues for FSM of more than $5.14 million over the course of FSM's existence.  (*See supra* pp. 6-7.)

*Fifth*, the Complaint's contention that Defendants have "unified administrative control" has no factual support either.  As discussed above, FSM's day-to-day operations were conducted and managed by Messrs. O'Connor and McKinney – i.e., FSM's two employees who were located at FSM's own, dedicated facility in Easton, Pennsylvania.  (*See id*.)  Those individuals had no employment or other relationships with MMI, GRI or NAIC.  (*Id.*)  FSM maintained separate corporate records, bank accounts and insurance policies, and the company filed its own tax returns.  (*Id.* at 8.)

*Sixth*, the Complaint's contention that Defendants failed to "adequately fund" FSM is entirely conclusory and otherwise meritless.  At the outset, neither MMI nor NAIC had any ownership interest in FSM, and they did not have any obligation to "fund" FSM's operations.  Further, FSM conducted operations for five full years, generating millions of dollars in revenues.  (*See supra* pp. 6-9 & Ex. 4.)  The company's internal financial statements and tax returns reflect years of operations during which FSM satisfied all of its financial obligations as they became due.  (*See id.* & Ex. 6.)

*Finally*, the Complaint baldly declares that MMI, GRI and NAIC fraudulently misled FSM's "creditors."  (*See, e.g.*, Compl. ¶ 20.)  Once again, however, the Complaint is entirely devoid of any factual allegations as to the identity of any "creditors" that were "misled"; when, how and by whom they were misled; what actions they allegedly took in reliance on any such alleged misrepresentations; or what any of the defendants allegedly gained as a result.  *See generally Car Sense, Inc. v. Am. Special Risk, LLC*, 56 F. Supp. 3d 686, 695 (E.D. Pa. 2014) ("The elements of fraudulent misrepresentation under Pennsylvania law are: (1) a representation;

(2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.").

In sum, the Complaint's laundry-list of conclusory contentions falls woefully short of establishing a *prima facie* case of alter ego jurisdiction against *any* of the Defendants – let alone all of them.  In fact, courts routinely reject claims of alter ego jurisdiction against foreign parents who exercise a level of control, involvement or overlap that simply does not exist here.  For example, in *Savin Corp. v. Heritage Copy Products, Inc.*, the plaintiff brought suit against a domestic company and asserted the alter ego theory of personal jurisdiction against its Canadian parent, a holding company.  *See* 661 F. Supp. 463, 469 (M.D. Pa. 1987).  As support for its argument, the plaintiff cited to the following facts: (i) statements by the parent company evidencing an intent to control the subsidiary, (ii) the parent company's ownership of the majority of the subsidiary's stock; (iii) overlap between the parent's and subsidiary's officers and directors; (iv) control over the subsidiary's operations by the parent's executives; (v) the parent's financial support to the subsidiary to meet the subsidiary's operating expenses; (vi) the parent's filing of consolidated financial statements that included the subsidiary; and (vii) the parent's use of the subsidiary's offices for one of the parent's employees.  *Id.* at 469-71.  After considering "the totality of the evidence submitted by" the plaintiff, the court concluded that plaintiff failed to meet its burden of establishing the existence of an alter-ego relationship.  *Id.* at 471.

The court reached the same conclusion in *Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830 (E.D. Pa. 1997).  There, the plaintiffs alleged jurisdiction over a foreign parent on the grounds (among others) that its domestic subsidiary was its alter ego.  *Id.* at 834.  As support, the

plaintiffs alleged that the foreign parent "originates, implements, directs, controls, manages, supervises and polices its [domestic subsidiary's] operations on a day-to-day basis." *Id.* at 837.

Rejecting the plaintiffs' contentions, the Court concluded that "the relationship between [the foreign parent] and [the domestic subsidiary] is that of an ordinary holding company/subsidiary relationship, not one of undue domination and control." *Id.* at 837-38. As support for its conclusion, the Court noted that (i) the two companies "have operated as separate and distinct corporate entities," with each having "its own offices, employees, directors and officers, . . . accounts, records and minutes";  (ii) the foreign parent provided its subsidiary "with substantial autonomy" insofar as the subsidiary "was responsible for managing its own . . . operations" and "prepared its own plans, estimates, and performance results"; and (iii) transactions between the parent and the subsidiary were conducted on terms applicable to arms' length transactions. *Id.* at 838-39.

The Court also rejected plaintiffs' claim that overlap between the two companies' directors or officers supported a finding of alter ego jurisdiction, explaining that "overlapping directors and officers do not alone establish an alter ego relationship." *Arch*, 984 F. Supp. at 838; *see also Poe v. Babcock Int'l, plc.*, 662 F. Supp. 4, 6 (M.D. Pa. 1985) (rejecting claim of alter ego jurisdiction and noting, "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to the boards of both").  The court likewise rejected as unsupported by any evidence plaintiffs' conclusory contention that the subsidiary was "insolvent" or that the parent "drained" its profits.  984 F. Supp. at 839-40.

Other cases are in accord.  *See, e.g.*, *Clark v. Matsushita Elec. Indus. Co.*, 811 F. Supp. 1061, 1067-70 (M.D. Pa. 1993) (finding no alter ego jurisdiction existed over parent company

that wholly owned the subsidiary, had one director in common with subsidiary, used subsidiary
as its exclusive U.S. distributor, and "lump[ed] together" subsidiary's financial information into
parent company's annual report); *Indian Coffee Corp.*, 482 F. Supp. at 1104 (rejecting claims of
alter ego jurisdiction over parent company based on evidence that the "directors, board meetings,
shareholder meetings, records, accounts, tax returns, and decisions concerning day-to-day
operations of its two subsidiaries . . .  [were] entirely separate from [the parent company]."),
*aff'd*, 752 F.2d 891 (3d Cir. 1985).

(b)    <strong>Mr. MacKenzie</strong>

There is no basis for the Court to exercise personal jurisdiction over Mr. MacKenzie
either.  As discussed above, "a court does not have personal jurisdiction over an individual
defendant whose only contacts with the forum state were taken in his or her corporate capacity."
*United Prod. Corp.*, 122 F. Supp. 2d at 562 (citations omitted) (collecting cases).  There are two
narrow exceptions to that rule: "when the corporate officer is charged with (1) committing a tort
in his corporate capacity or (2) violating a statutory scheme that provides for personal, as well as
corporate, liability for corporate actions."  *Id.*  Neither of those exceptions apply here.

At the outset, the Complaint does not assert any statutory theories of liability against
Mr. MacKenzie that provide for personal liability for corporate actions.  In an apparent effort to
fit this case within the first exception, the Complaint alleges, in wholly conclusory manner, that
Mr. MacKenzie (i) "entered into significant transactions in Pennsylvania and directed numerous
communications to the forum"; (ii) "took active part in the commission of the foregoing
misrepresentations"; and (iii) "breached his fiduciary duties owed to [FSM's] creditors by
ceasing to fund [FSM]."  (Compl. ¶¶ 14, 68, 69.)  None of those conclusory allegations have any
factual detail, support or merit.

There are no "transactions" described in the Complaint that Mr. MacKenzie "entered" in

his personal capacity, and as discussed above, actions that Mr. MacKenzie took in his role as

president of FSM (or any other entity, for that matter) do not subject him to personal jurisdiction

in this Court.  Second and also as discussed above, the Complaint contains no factual details of

any "misrepresentations" made by any of the other corporate Defendants, nor does the Complaint

set forth any of the other elements of a fraud claim.[11]  (*See supra* pp. 25-26.)  Third, there is

simply no factual or legal basis for the Trustee's conclusion that Mr. MacKenzie "owed fiduciary

duties" to FSM's debtors, or that he was obligated to "fund" FSM as part of any such fiduciary

obligation.  In sum, there is no basis whatsoever for the Court to exercise personal jurisdiction

over Mr. MacKenzie.

**B.     The Complaint Fails to State a Cognizable Claim for Relief.**

In addition to its jurisdictional deficiencies, the Complaint should be dismissed pursuant

to Rule 12(b)(6) because it fails to state a claim upon which relief can be granted.

**_1.     Legal Standard_**

"Because Federal Rule of Civil Procedure 8(a)(2) 'requires a "showing," rather than a

blanket assertion, of entitlement to relief,' courts evaluating the viability of a complaint under

Rule 12(b)(6) must look beyond conclusory statements and determine whether the complaint's

well-pled factual allegations, taken as true, are 'enough to raise a right to relief above the

speculative level.'"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010)

(*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 & n.3 (2007)).  As the U.S. Supreme

Court explained in *Iqbal*, the pleading standard set forth in Rule 8 "does not require 'detailed

---

[11]     Indeed, if the Complaint had asserted a misrepresentation claim (which it does not), such
a claim would be subject to dismissal under Fed. R. Civ. P. 9(b).  Under Rule 9(b), "[i]n alleging
fraud or mistake, a party must state with particularity the circumstances constituting fraud or
mistake." *Id.*

factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Id.* (citation omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (citation omitted).  Finally, in evaluating a motion to dismiss under Rule 12(b)(6), the Court should ignore "unsupported conclusions and unwarranted inferences," or "a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

### 2.    The Complaint Contains No Facts Supporting a Veil-Piercing Claim.

"There is a strong presumption in Pennsylvania against piercing the corporate veil." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1277 (Pa. Super. Ct. 2004) (citation omitted).  As the Pennsylvania Supreme Court has explained, "any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. . . .  Care should be taken on all occasions to avoid making the entire theory of the corporate entity . . . useless." *Wedner v. Unemployment Board*, 296 A.2d 792, 794 (Pa. 1972) (citation and internal marks omitted).  Courts consider the following factors when determining whether to pierce the corporate veil: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and

personal affairs, and (4) use of the corporate form to perpetrate a fraud." *Lomas v. Kravitz*, 130
A.3d 107, 126 (Pa. Super. Ct. 2015) (citation omitted), *aff'd*, 170 A.3d 380 (Pa. 2017).
Importantly, "Pennsylvania law requires that a veil-piercing claim be 'supported by specific
factual averments, rather than mere legal conclusions.'" *Shenango Inc. v. Am. Coal Sales Co.*,
No. 2:06-CV-149, 2007 WL 2310869, at *3 (W.D. Pa. Aug. 9, 2007) (citations omitted).

As discussed above, the Complaint's veil-piercing allegations against MMI, GRI and
NAIC consist of (i) a list of bare legal conclusions framed in the form of factual allegations; and
(ii) references to a handful of attached documents that do not support the propositions for which
they are cited. (*See generally* pp. 19-24.) Even on their face, the Complaint's allegations fail to
set forth the basic factual contours of a legally cognizable claim.

Specifically, the Complaint contains no *facts* permitting the inference that FSM was, in
fact "undercapitalized," nor does the Complaint provide any factual basis for the conclusion that
FSM "failed to adhere to corporate formalities." Further, there are no factual allegations that the
various Defendants "intermingled" their affairs with those of FSM, or that any of them used
FSM to "perpetrate a fraud." There are no allegations regarding the time, place or the specific
actions taken by each Defendant, how or why any such conduct took place in each Defendant's
extra-corporate capacity, or how the relationships between or among the various parties justify
veil-piercing.

Where, as here, a plaintiff's complaint does nothing more than recite the legal elements
of a veil-piercing claim, courts consistently dismiss such claims under Rule 12(b)(6). For
example, in *Partners Coffee Co., LLC v. Oceana Services & Products Co.*, the court dismissed a
corporate veil-piercing claim that "consist[ed] of nothing more than a list of the factors
identified" as part of a veil-piercing analysis. 700 F. Supp. 2d 720, 737 (W.D. Pa. 2010). In so

doing, the court concluded that "[t]his Court is 'not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Id.* at 737-38 (citation omitted).

In *Essex Insurance Co. v. Miles*, the court likewise dismissed a corporate-piercing claim premised upon "a formulaic recitation of the elements of [the] cause of action." No. CIV.A. 10-3598, 2010 WL 5069871, at *3 (E.D. Pa. Dec. 3, 2010) (citation omitted). As the *Essex* court noted, "[r]eliance by [the plaintiff] on information and belief cannot transform legal conclusions into plausible factual allegations." *Id.* (citation omitted).

The court reached the same conclusion in *Shenango Inc.*, 2007 WL 2310869. There, as here, the complaint contained "no recitation of any facts regarding the time, place or manner of actual conduct that would support the [plaintffs'] conclusions." *Id.* at *2. The court observed, for instance, that "although plaintiffs allege that [the corporate defendant] was undercapitalized, [the complaint] does not identify any facts about its finances, its relationship with its sister companies, or any other specifics." *Id.* Further, the court explained that plaintiffs failed to plead "facts sufficient to support its claim that [an individual defendant] acted in a personal capacity rather than in his role as an executive of [defendant corporations], such that the corporate veil should be pierced." *Id.* at *4; *see also id.* ("[A]verments reciting elements of the veil-piercing test, without any supporting facts, constitute legal conclusions. . . . Simply alleging [personal defendant's] ownership and control over the corporations is 'irrelevant and immaterial,' because a Pennsylvania corporation is strongly presumed to be independent even if owned by one person." (citation omitted)).

In sum, because the Complaint fails to allege any *facts* that would support a veil piercing claim (or any other claim), it should be dismissed in its entirety and with prejudice.[12]

## IV.    CONCLUSION

The Due Process Clause of the U.S. Constitution imposes strict and specific constraints on this Court's ability to exercise personal jurisdiction over a foreign defendant.  And, as the Supreme Court explained, "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  *Asahi Metal Indus. Co.*, 480 U.S. 115.  The Trustee's Complaint utterly fails to establish such a jurisdictional predicate here. Indeed, if Trustee's conclusory and scatter-shot allegations were sufficient to hale the four Defendants into this Court, the strictures of the Due Process clause would be reduced to a rubber stamp, and any plaintiff could wield this Court's personal jurisdiction power simply by including in the complaint a conclusory recitation of the legal elements of a veil-piercing claim.  But that is not the law.  Accordingly, because this Court's exercise of personal jurisdiction over any of the Defendants would plainly offend "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co.*, 480 U.S. 113, the Court should dismiss the Complaint in its entirety.

---

[12]    Because the Complaint contains no legal counts whatsoever and otherwise lacks any indication regarding which claims are being asserted against each of the Defendants, the D efendants reserve the right to address as part of their reply any other additional legal claims that the Trustee attempts to assert or identify as part of its response to this motion.

Respectfully Submitted,

COHEN & GRIGSBY, P.C.

By:   s/Fridrikh V. Shrayber
      Fridrikh V. Shrayber (Pa. I.D. No. 208083)
      Katie R. Jacobs (Pa. I.D. No. 307385)
      (admission *pro hac vice* forthcoming)
625 Liberty Avenue
Pittsburgh, PA  15222-3152
Ph:  (412) 297-4900 / Fax:  (412) 209-0672
fshrayber@cohenlaw.com
kjacobs@cohenlaw.com

Attorneys for Defendants
Metalo Manufacturing Inc., Grand River Ironsands
Incorporated, North Atlantic Iron Corporation,
and Francis MacKenzie

Dated:  June 17, 2019
3047021.v1