IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| FORKS SPECIALTY METALS INC., | ) | Case No. 17-18601-mdc |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LYNN E. FELDMAN, ESQUIRE, | ) | Adversary No. 19-00028-mdc |
| Trustee for the ESTATE OF FORKS | ) | |
| SPECIALTY METALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRAND RIVER IRONSANDS | ) | |
| INCORPORATED, NORTH ATLANTIC | ) | |
| IRON CORPORATION, METALO | ) | |
| MANUFACTURING INC. f/k/a MUSKRAT | ) | |
| MINERALS INCORPORATED, and | ) | |
| FRANCIS MACKENZIE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO
STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND ...................................................................................... 1

    A.    The Parties ...................................................................................................... 1

        1.    Metalo Manufacturing Incorporated ........................................... 1

        2.    Grand River Ironsands Incorporated........................................... 2

        3.    North Atlantic Iron Corporation ................................................. 4

        4.    Francis MacKenzie ...................................................................... 4

        5.    Forks Specialty Metals Incorporated ......................................... 5

    B.    The Trustee's Claim ..................................................................................... 10

III.    LEGAL ARGUMENT............................................................................................... 10

    A.    This Court Lacks Personal Jurisdiction Over the Defendants .............................. 10

        1.    Legal Standard ....................................................................... 11

        2.    This Court Does Not Have General Jurisdiction Over Any of the Defendants ................................................................................ 13

        3.    This Court Does Not Have Specific Jurisdiction Over Any of the Defendants ................................................................................ 14

        4.    The Trustee's Theory of Jurisdiction is Meritless ................... 18

    B.    The Complaint Fails to State a Cognizable Claim for Relief .............................. 30

        1.    Legal Standard ....................................................................... 30

        2.    The Complaint Contains No Facts Supporting a Veil-Piercing Claim....................................................................................... 31

IV.    CONCLUSION......................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411 (E.D. Pa. 2005).......................... 21

*Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*,
    846 A.2d 1264 (Pa. Super. Ct. 2004)....................................................................... 31

*Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830 (E.D. Pa. 1997) ........................ 20, 28, 29

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102 (1987) .................................... 14, 34

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .......................................................................... 31

*Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007)...................................................... 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 31

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985)......................................................... 14

*Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925)................................... 19

*Car Sense, Inc. v. Am. Special Risk, LLC*, 56 F. Supp. 3d 686 (E.D. Pa. 2014).......................... 27

*Carmen Enters., Inc. v. Murpenter, LLC*, 185 A.3d 380 (Pa. Super. Ct. 2018) ........................... 15

*Carteret Savings Bank, F.A. v. Shushan*, 954 F.2d 141 (3d Cir. 1992) ....................... 12

*Chavez v. Dole Food Company*, Inc., 836 F.3d 205 (3d Cir. 2016) .............................. 13

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) .............................................................. 13

*Essex Insurance Co. v. Miles*, No. CIV.A. 10-3598, 2010 WL 5069871
    (E.D. Pa. Dec. 3, 2010) ........................................................................................ 33

*Gen. Electric Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001) ................................... 12, 13

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ........................... 12, 14

*In re Celotex Corp.*, 124 F.3d 619 (4th Cir. 1997) ...................................................... 12

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538 (M.D. Pa. 2009) ............... 20

**Page(s)**

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*,
735 F. Supp. 2d 277 (W.D. Pa. 2010) ...................................................... 19

*In re Flabeg Solar US Corp.*, 561 B.R. 364 (Bankr. W.D. Pa. 2016) .................................... 11, 12

*Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1098 (W.D. Pa. 1980) ............ 18, 29

*In re Commodore Int'l, Ltd.*, 242 B.R. 243 (Bankr. S.D.N.Y. 1999) ..................................... 17, 18

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).................................................. 31

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ....................................................... 11

*Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290 (3d Cir. 2008) .................................................. passim

*Koch v. Pechota*, 744 F. App'x 105 (3d Cir. 2018).............................................................. 13, 14

*Lionti v. Dipna, Inc.*, Civ. No. 17-1678, 2017 WL 2779576 (E.D. Pa. June 27, 2017)................ 12

*Lomas v. Kravitz*, 130 A.3d 107 (Pa. Super. Ct. 2015).................................................................... 32

*Marten v. Godwin*, 499 F.3d 290 (3d Cir. 2007) ........................................................................... 12

*McCann v. Newman Irrevocable Trust*, 458 F.3d 281 (3d Cir. 2006).......................................... 13

*Mellon Bank (East) PSFS, N.A. v. Farino*, 960 F.2d 1217 (3d Cir. 1992) ................................... 12

*Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429 (5th Cir. 2014) ................................................ 13

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007)................................................ 14

*Partners Coffee Co., LLC v. Oceana Services & Products Co.*, 700 F. Supp. 2d 720
(W.D. Pa. 2010) ......................................................................................................................... 33

*Poe v. Babcock Int'l, plc.*, 662 F. Supp. 4 (M.D. Pa. 1985) ......................................................... 28

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140
(3d Cir. 1972)............................................................................................................................. 19

*Savin Corp. v. Heritage Copy Prod., Inc.*, 661 F. Supp. 463 (M.D. Pa. 1987) ............... 18, 21, 27

*Shenango Inc. v. Am. Coal Sales Co.*, No. 2:06-CV-149, 2007 WL 2310869
(W.D. Pa. Aug. 9, 2007) ....................................................................................................... 32, 33

*Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*,
360 F. Supp. 2d 665 (E.D. Pa. 2005) ......................................................................................... 20

**Page(s)**

*Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61 (3d Cir. 1984) .............................. 12

*United Prod. Corp. v. Admiral Tool & Mfg. Co.*, 122 F. Supp. 2d 560
   (E.D. Pa. 2000).................................................................................................... 17, 29

*Wedner v. Unemployment Board*, 296 A.2d 792 (Pa. 1972)........................................... 32

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980).............................. 11

**Statutes**

28 U.S.C. § 1334................................................................................................................ 11

**Rules**

Fed. R. Bankr. P. 7004...................................................................................................... 11

Fed. R. Bankr. P. 7004(f) .................................................................................................. 11

Fed. R. Bankr. P. 7012(b) ................................................................................................. 11

Fed. R. Civ. P. 4 ................................................................................................................ 11

Fed. R. Civ. P. 8 ................................................................................................................ 31

Fed. R. Civ. P. 8(a)(2)....................................................................................................... 30

Fed. R. Civ. P. 9(b) ........................................................................................................... 30

Fed. R. Civ. P. 12(b)(2)..................................................................................................... 11

Fed. R. Civ. P. 12(b)(6)............................................................................................ 30, 31, 33

Specially-appearing Defendants Grand River Ironsands Incorporated, North Atlantic Iron Corporation, Metalo Manufacturing Inc., and Francis MacKenzie (collectively, "Defendants") file this Brief in Support of their Motion to Dismiss Plaintiff's Complaint.

## I.     INTRODUCTION

Trustee brings this action against three Canadian corporations and a Canadian citizen. The Complaint contains no legal counts and does not otherwise articulate the legal or factual basis of Trustee's claims against any of the Defendants.  Instead, it reads like a run-on catalogue of legal conclusions seemingly designed to track the elements of a veil-piercing claim, which Trustee appears to assert against all of the Defendants.

The Complaint must be dismissed for two principal reasons.  First, this Court does not have personal jurisdiction over any of the defendants.  None of the Defendants has any meaningful connections to the United States whatsoever, and the handful of contacts that do exist (with respect to only two of the four defendants) are not related to the Trustee's claim.  Second and putting aside its jurisdictional deficiencies, the Complaint falls woefully short of articulating any facts that could even arguably support a veil-piercing claim (or any other claims) against any of the Defendants.  Accordingly, the Court should dismiss the Complaint in its entirety and with prejudice.

## II.     FACTUAL BACKGROUND

### A.     The Parties

#### 1.     *Metalo Manufacturing Incorporated*

Metalo Manufacturing Incorporated ("MMI") is a Canadian corporation that is traded publicly on the Canadian Securities Exchange (CSE: MMI).  The company was incorporated under the laws of the Province of Alberta, Canada, and has its headquarters in Toronto, Canada.

(Decl. of Francis MacKenzie ¶ 9, June 13, 2019, attached as Exhibit 1;[1] *see also* Metalo

Manufacturing Inc. Audited Cons. Fin. Stmts. for Year Ended June 30, 2018 at 5 ("2018 MMI

Fin. Stmts.), attached as Exhibit 2; Ex. 1, MacKenzie Decl. ¶ 69.)[2]  The company holds an equity

stake (directly and indirectly) in several companies that are engaged in the exploration and

development of iron ore throughout Canada and the development and construction of a

manufacturing plant to produce high purity pig iron for steel mills and foundries.  (Ex. 1,

MacKenzie Decl. ¶ 10.)  MMI is governed by an eight-member board of directors.  (*Id.*)

Between 2012 and 2017, the company's operations were overseen by five officers.  (*Id.*)

MMI has never conducted business, has never maintained any offices, has never held any

bank accounts and has never owned any property in the United States.  (*Id.* ¶ 11.)  The company

has never employed any individuals in the United States, with the exception of Kevin Kemper,

the company's vice president since 2016, who provided services for the company (in Canada)

from his home office in New York state.  (*Id.* ¶ 12.)  MMI is not authorized to conduct business

in the United States.  (*Id.* ¶ 15.)  MMI does not have an agent authorized to accept service in the

United States.  (*Id.* ¶ 16.)

### 2.    *Grand River Ironsands Incorporated*

Grand River Ironsands Incorporated ("GRI") is a Canadian company incorporated under

the laws of the Province of Nova Scotia, Canada, and has its headquarters in Halifax, Canada.

(Ex. 1, MacKenzie Decl. ¶ 17.)  GRI is (indirectly) engaged in the exploration and development

of iron ore located in the iron sands of Labrador, Canada.  (*Id.* ¶ 18.)  GRI is governed by a six-

---

[1]    Exhibit 1 has been amended pursuant to Chief Judge Coleman's July 19, 2019 Order
(ECF 17), and is attached hereto.  Exhibits 2-9 cited herein were filed previously with the
Defendants' initial brief at ECF 8.

[2]    For the sake of brevity and confidentiality, Defendants' exhibits are filed in partially
redacted and truncated form.  Complete, unredacted copies of all of the exhibits are available for
the Court's review.

member board of directors.  (*Id.* ¶ 19.)  During the period between 2012 and 2017, GRI's

operations were overseen by six officers.  (*Id.*)  MMI has owned between 40% and 44% of GRI's

stock between 2012 and 2017.  (*Id.* ¶ 20.)  GRI owns 100% of the stock of Forks Specialty

Metals, Inc., the debtor herein.  (*Id.* ¶ 39.)  GRI is not authorized to conduct business, and does

not have an agent authorized to accept service, in the United States.  (*Id.* ¶¶ 24, 26.)

    GRI has never conducted business, has never maintained any offices,[3] has never held any

bank accounts and has never owned any real property in the United States.  (*Id.* ¶ 21.)[4]  Putting

Mr. Kemper aside, GRI does not employ any individuals in the United States.  (*Id.* ¶ 25.)  Putting

aside its ownership interest in FSM, GRI's only other connection to the United States was its

retention of a New York based investment bank (Brock Capital of New York) to raise and

structure $408 million required to manufacture a pig iron plant in Quebec, Canada (the "Pig Iron

Plant Project"), which will be owned and operated by GRI.  (*Id.* ¶ 22.)  The Pig Iron Plant

Project is still in its planning and development stages, and GRI is several steps away from

commencing any physical development or construction on the project.  (*Id.* ¶ 23.)  In connection

with its planned development of the Pig Iron Plant Project, GRI also recently engaged in limited,

preliminary discussions no more than five U.S.-based steel companies.  (*Id.*)  Importantly,

however, those discussions were general and brief in nature, and there have been no negotiations

or agreements with any of those company to date.  Those discussions had nothing to do with the

debtor or its business.  (*Id.* ¶ 23.)

---

[3]    GRI's vice president, Kevin Kemper, maintained a personal home office in New York
state.  (*Id.* ¶ 25.)

[4]    GRI did send certain industrial equipment to the debtor entity at the time of its founding
for use in the debtor's operations, but GRI has abandoned any claim it had to that equipment
before the debtor's bankruptcy filing in late 2017.  (*Id.* ¶ 21.)

### 3.    North Atlantic Iron Corporation

North Atlantic Iron Corporation ("NAIC") is a Canadian company incorporated under the laws of the Province of Newfoundland and Labrador, Canada, with its headquarters in Bedford, Nova Scotia, Canada.  (Ex. 1, MacKenzie Decl. ¶ 28.)  NAIC was a joint venture between GRI and Petmin Limited, a South African publicly traded corporation, between 2012 and 2017.  (*Id.* ¶ 29.)  GRI's ownership stake in NAIC was approximately 60% during the period between 2012 and 2017.[5]  (*Id.* ¶ 30.)  NAIC was governed by a five-member board of directors between 2012 and 2017.[6]  (*Id.* ¶ 31.)  NAIC had three officers during 2012 and between four and six officers between 2013 and 2017.  (*Id.* ¶ 31.)

NAIC is engaged in the exploration and development of mineral sands and holds mineral mining rights to property located in Labrador, Canada.  (*Id.* ¶ 32.)  The company has never maintained any offices, has never held any bank accounts and has never owned any property in the United States.  (*Id.* ¶ 33.)  Putting Mr. Kemper aside, NAIC does not employ any individuals in the United States.[7]  (*Id.* ¶ 34.)  NAIC was party to a third-party smelting arrangement with FSM during the period between 2012 and 2017.  (*Id.* ¶ 35.)  That relationship aside, NAIC has not solicited or conducted any business in the United States.  (*Id.*)  NAIC does not have an agent authorized to accept service in the United States.  (*Id.* ¶ 34.)

### 4.    Francis MacKenzie

Francis MacKenzie is a Canadian citizen who resides in the town of Bedford, in the Province of Nova Scotia, Canada.  (Ex. 1, MacKenzie Decl. ¶ 3.)  He is the president and a board

---

[5]      In 2018, GRI's ownership stake in NAIC increased to 90% as part of an overarching separation of GRI's and Petmin Limited's business dealings.  (*Id.* ¶ 30.)

[6]      After the relevant time frame, GRI and Petmin Limited restructured their joint ownership of NAIC such that GRI currently owns 90% of NAIC, and NAIC's affairs are now governed by a three-member board of directors.  (*Id.* ¶ 31.)

[7]      Mr. Kemper does serve as NAIC's vice president.  (*Id.* ¶ 34.)

member of each of MMI, GRI and NAIC.  (*Id.* ¶ 4.)  He was also president and a board member

of FSM between 2012 and 2017.  (*Id.* ¶ 5.)  Mr. MacKenzie is the only common director on the

boards of MMI, GRI, NAIC and FSM.[8]  (*Id.*)  He has not resided, owned real property,

maintained any bank accounts or had any personal dealings in the United States during at least

the past 35 years.  (*Id.* ¶ 8.)

### 5.    *Forks Specialty Metals Incorporated*

Debtor Forks Specialty Metals, Inc. ("FSM") is a Pennsylvania corporation with its

principal (and only) place of business located at 3700 Glover Road, Easton, Pennsylvania 18040.

(Compl. ¶ 7, Feb. 8, 2019 (ECF 1); Ex. 1, MacKenzie Decl. ¶ 38.)  FSM is a wholly owned

subsidiary of GRI.  (*Id.* ¶ 39.)  The company was formed in November of 2012.  (*Id.*; Compl. ¶ 7.)

FSM's initial business objectives were two-fold:  to attempt to (i) produce

ferromanganese,[9] and (ii) function as a contract smelting facility for third-party producers of iron

ore, steel, specialty alloys and other recycled materials.  (*See* Forks Specialty Metals, Inc.

Business Summary at 3, Jan. 23, 2013 (the "2013 FSM Business Summary"), attached as Ex. C

to Compl. (ECF 1-3)); *see also* Ex. 1, MacKenzie Decl. ¶ 40.)  FSM conducted its operations

from a single 181,000 square-foot manufacturing facility located in Easton, Pennsylvania, which

it occupied pursuant to a long-term lease that the company signed in 2012 with an unrelated

third-party entity.  (2013 FSM Business Summary at 16; *see also* Ex. 1, MacKenzie Decl. ¶ 41.)

---

[8]    By way of additional background, Mr. MacKenzie has a long history of political and public service and involvement in Nova Scotia.  He held leadership roles on several economic development partnership organizations in Nova Scotia until the early 2000s, when he was elected as the leader of the Nova Scotia Liberal Party – a role he held until 2006.  (Ex. 1, MacKenzie Decl. ¶ 6.)  He became president and a director of GRI in 2007.  (*Id.* ¶ 6.)  He joined MMI and NAIC in 2012.  (*Id.* ¶ 7.)

[9]    Ferromanganese is a manganese alloy produced by heating manganese ore with coal in a furnace.

To support its operations, FSM acquired two submerged arc furnaces ("SAFs") from the

Pennsylvania Department of Community and Economic Development ("PADCED").  (*Id.* ¶ 42.)

The company purchased the SAFs from PADCED for $1.6 million, the entirety of which was

financed pursuant to a promissory note issued by PADCED to FSM.  (*Id.*)  That transaction is

memorialized in a Bill of Sale signed by PADCED and an accompanying Note signed by FSM.[10]

(*See* Ex. B to Compl. at 5-6, 14-18 (ECF 1-2).)  None of the Defendants signed any guarantees or

other documents in connection with FSM's real-estate lease or SAF purchases.  (Ex. 1,

MacKenzie Decl. ¶ 43.)

From FSM's inception, Mr. MacKenzie served as the company's president.  (*Id.* ¶ 44.)

Kevin Kemper was the company's vice president and secretary.  (*Id.*)  Messrs. MacKenzie and

Kemper served as the company's two directors.  (*Id.* ¶ 45.)  In November of 2014, FSM

appointed a third officer, Lina Tannous.  (*Id.* ¶ 44.)

Messrs. MacKenzie and Kemper regularly met and passed resolutions relating to FSM's

business, records of which were maintained by FSM.  (*Id.* ¶ 45; *see also* Minutes of Mtgs. and

Resolutions of FSM, attached as Exhibit 3.)  Mr. Kemper is not and has never been a director of

MMI, NAIC or GRI.  (Ex. 1, MacKenzie Decl. ¶ 46.)  As discussed above, Mr. Kemper is the

vice president of MMI (since 2016), GRI (since 2012) and NAIC (since 2012).)  (*Id.*)

Importantly, however, while Mr. Kemper, Ms. Tannous and Mr. MacKenzie had officer

positions with each of the corporate defendants and FSM (during the periods set forth above),

MMI's remaining two officers had no role or involvement with FSM; GRI's remaining three

---

[10]    As the Bill of Sale provides, the SAFs were repossessed by PADCED after their former
owner, RSI Silicon Products, LLC, defaulted on a loan agreement between PADCED and that
entity.  (*See* Ex. B to Compl. at 5 (ECF 1-2).)  RSI Silicon Products, LLC was the previous
tenant of FSM's facility.

officers had no role or involvement with FSM; and NAIC's remaining three officers had no role or involvement with FSM.  (*Id.*)

FSM's principal employees were two industry experts, whom FSM hired to manage the company's day-to-day operations:  William O'Connor and Christopher McKinney.  (*Id.* ¶ 47.) From time to time, FSM retained additional individuals on a temporary, as-needed basis in connection with specific smelting operations.  (*Id.*)  Mr. McKinney was the company's general manager; Mr. O'Connor led the company's process development efforts.  (*Id.* ¶ 48.)  Both Mr. McKinney and Mr. O'Connor have extensive experience and knowledge in the installation, commissioning and operation of arc furnaces.  (*Id.* ¶ 49.)  They managed the company's operations from the company's facility in Easton, Pennsylvania.  (*Id.*)  Neither Mr. O'Connor nor Mr. McKinney were employed by or otherwise provided any services to MMI, NAIC or GRI during FSM's operations.  (*Id.* ¶ 50.)  In turn, no employees of MMI, GRI or NAIC were employed by FSM.  (*Id.* ¶ 51)  (As set forth above, Messrs. Kemper and MacKenzie and, later, Ms. Tannous served as officers of FSM, but they were not paid for serving in those roles beyond the compensation we received from GRI.  (*Id.*).)  FSM paid wages and provided other fringe benefits to Mr. O'Connor and Mr. McKinney until the company's bankruptcy.  (*Id.* ¶ 52.)  FSM also paid compensation to the other individuals it retained from time to time on a temporary, as-needed basis.  (*Id.*)

FSM anticipated two principal sources of revenue:  third-party contract smelting operations and the production of ferromanganese.  (*See* 2013 FSM Business Summary at 7-8 (ECF 1-3); *see also* Ex. 1, MacKenzie Decl. ¶ 53.)  Although FSM acquired all of the equipment required to undertake those operations, the company intended to raise an additional $6 million to

support future expansion efforts through the sale of up to a 70% equity stake in the company to a third party.  (2013 FSM Summary at 3-4, 22; Ex. 1, MacKenzie Decl. ¶ 53.)

From the company's inception, FSM had a stable revenue stream in the form of a smelt-test arrangement with NAIC, which was designed to compensate FSM for all of its costs of performing such testing.  (*Id.* ¶ 54.)  In that respect, FSM served as a testing facility for NAIC from its inception while it pursued other business opportunities with third parties.  (*Id.*)  And, during the company's five-year existence, FSM generated approximately $5.14 million in revenue from that smelting arrangement with NAIC, which were used by FSM to pay its expenses and invoices as they became due.  (*Id.*)  During that period, FSM also performed third-party smelting services for several other companies, albeit on a more limited, also on a cost-recovery basis.  (*Id.*)

With its third-party smelting operations underway, Messrs. O'Connor and McKinney undertook extensive efforts on FSM's behalf to identify and form agreements with other companies and to identify potential customers for the company's ferromanganese production operations.  (*Id.* ¶ 55.)  The company made numerous proposals and pursued extensive discussions with multiple potential partners.  (*Id.* ¶ 56.)  Messrs. O'Connor and McKinney provided regular updates on their efforts to Messrs. Kemper and MacKenzie in their roles as FSM's directors and officers.  (*Id.* ¶ 57.)  FSM was responsible for managing its own operations.  (*Id.* ¶ 58.)  Putting aside Mr. Kemper's, Ms. Tannous' and Mr. MacKenzie's involvement as officers of the FSM, no employee or other representative of MMI, GRI or NAIC had any managerial input or control with respect to FSM's operations.  (*Id.* ¶ 58.)

FSM ultimately determined that the SAFs were not capable of producing the required grade of ferromanganese.  (*Id.* ¶ 59.)  As part of its marketing efforts, the company further

refined its business strategy to attempt to capitalize on opportunities in the recovery of precious metals from electronic scrap ("e-scrap") and the recovery of platinum metals from autocatalysts. (*Id.* ¶ 60.)  The company discussed with several companies an arrangement whereby that company would provide an equity stake in FSM in exchange for capital investment and a supply of materials for use in FSM's e-scrap operations.  (*Id.*)

None of MMI, GRI or NAIC has ever been engaged in the production of ferromanganese, nor has any of them ever conducted operations as a third-party smelting facility.  (*Id.* ¶ 61.) None of those entities were ever engaged in the recovery of precious metals from e-scrap or the recovery of platinum metals from autocatalysts.  (*Id.*)  MMI, GRI and NAIC did not even operate any smelting facilities or furnaces between 2012 and 2017.  (*Id.*)  In turn, FSM was never involved in the exploration, extraction, processing or manufacture of pig iron.  (*Id.*)

Throughout the course of its operations, FSM maintained separate internal accounting and financial records.  (*Id.* ¶ 63; *see also, e.g.*, FSM Financial Statements for Years 2013-2017, attached as Exhibit 4.)  Shortly after it commenced operations, the company opened its own bank account.  (*Id.* ¶ 64; *see also, e.g.*, FSM Bank Account Statements for July 2014, 2015, and 2016, attached as Exhibit 5.)  FSM filed its own tax returns and maintained a full portfolio of its own insurance policies (including workers compensation coverage, automobile coverage, pollution coverage, and general commercial coverage, among others).  (*Id.* ¶ 65; *see also* FSM Tax Return excerpts for 2012, 2014, 2015 and 2017, attached as Exhibit 6.)  In short, FSM maintained stable operations – and paid all of its bills as they became due.  (*See generally* Ex. 4, FSM Financial Statements for Years 2013-2017.)

Despite its extensive efforts, FSM was ultimately unsuccessful in finding a market or a strategic partner for its e-scrap operations.  (Ex. 1, Mackenzie Decl. ¶ 66.)  In connection with

those efforts, FSM conducted extensive testing (at a cost of hundreds of thousands of dollars)
and entered into letters of intent with several business partners, including Elemental Recycling,
LLC and BASF.  Those entities ultimately informed FSM that they no longer wished to pursue a
business relationship within the framework discussed by the parties.  (*Id.*)  FSM's effort to
manufacture ferromanganese also fell short.  (*Id.*)  The company fell behind on its lease
payments on its facility and on its loan with PADCED.  (*Id.* ¶ 67.)  In the spring of 2017, FSM's
landlord confessed judgment against FSM.  (*Id.*)  In December of 2017 – i.e., five years after it
began operations – the company filed for bankruptcy protection under Chapter 7 of the U.S.
Bankruptcy Code.  (Compl. ¶ 5.)

**B.      The Trustee's Claim**

The Trustee commenced this adversary proceeding by filing a Complaint against MMI,
GRI, NAIC and Mr. MacKenzie on February 8, 2019.  (ECF 1.)  The Trustee's 107-paragraph
Complaint contains no legal counts and does not articulate the legal basis of any particular
claims with respect to any of the defendants.  In general terms, however, it appears that the
Trustee principally contends that this Court should "disregard" and "pierce" the corporate forms
of MMI, GRI and NAIC and enter a judgment in Trustee's favor against all four defendants for
the full amount of the claims of the bankruptcy estate (among other relief).  (*See generally*
Compl. at WHEREFORE Clause (ECF 1).)

### III.      LEGAL ARGUMENT

**A.      This Court Lacks Personal Jurisdiction Over the Defendants.**

The Court should dismiss the Complaint in its entirety because the Court lacks personal
jurisdiction over any of the Defendants.

### 1.   Legal Standard

As the Supreme Court explained long ago, the Due Process Clause "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945) (citations omitted).  Through those fundamental protections, the Constitution "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The defendants first move to dismiss the Complaint for lack of personal jurisdiction under Rule 12(b)(2), made applicable to adversary proceedings by Fed. R. Bankr. P. 7012(b). Pursuant to Fed. R. Bankr. P. 7004(f), three requirements must be met for the Court to exercise personal jurisdiction over each defendant: (1) service of process must have been made in compliance with Fed. R. Bankr. P. 7004 or Fed. R. Civ. P. 4; (2) the Court must possess subject matter jurisdiction pursuant to 28 U.S.C. § 1334; and (3) the exercise of jurisdiction must be consistent with the Constitution and laws of the United States.  *In re Flabeg Solar US Corp.*, 561 B.R. 364, 368 (Bankr. W.D. Pa. 2016) (citation omitted).  As set forth more fully below, the third requirement has not – and cannot – be satisfied here.

To satisfy constitutional due process, each Defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (citations and internal marks omitted).  "In proceedings arising in or related to a case under the Bankruptcy Code, personal jurisdiction is assessed based upon a defendant's contacts with the United States

as a whole, as opposed to a particular state." *In re Flabeg Solar US Corp.*, 561 B.R. at 368-69

(citing cases); *see also In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir. 1997) (same).

In evaluating a personal jurisdictional motion, the Court employs a burden-shifting

analysis. In particular, "[w]hen a defendant raises the defense of the court's lack of personal

jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish

that jurisdiction is proper." *Mellon Bank (East) PSFS, N.A. v. Farino*, 960 F.2d 1217, 1223 (3d

Cir. 1992) (citation omitted). In that respect, "the plaintiff bears the burden to prove, by a

preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Carteret*

*Savings Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992) (citations omitted). The

plaintiff "may not rely on [its] bare pleadings" and must instead counter defendant's affidavits

with contrary evidence. *Lionti v. Dipna, Inc.*, Civ. No. 17-1678, 2017 WL 2779576, at *1 (E.D.

Pa. June 27, 2017) (internal marks omitted) (*quoting Time Share Vacation Club v. Atl. Resorts,*

*Ltd.*, 735 F.2d 61, 66, n.9 (3d Cir. 1984)). In other words, the plaintiff "must respond to the

defendant's motion with 'actual proofs'; 'affidavits which parrot and do no more than restate

[the] plaintiff's allegations . . . do not end the inquiry.'" *Id.*

Federal courts recognize two types of personal jurisdiction: "General jurisdiction exists

when a defendant has maintained systematic and continuous contacts with the forum state.

Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at

the forum state." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (*citing Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & nn.8-9 (1984)); *Kehm Oil Co. v.*

*Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008) (same). In each instance, "[a] nexus between the

defendant, the forum and the litigation is the essential foundation of *in personam* jurisdiction."

*Gen. Electric Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). As discussed more fully below, neither type of personal jurisdiction exists here.

>    **2.      *This Court Does Not Have General Jurisdiction Over Any of the Defendants.***

As the Supreme Court explained recently, general jurisdiction over a foreign corporation typically arises only when that corporation's "affiliations with the [forum] are so continuous and systematic as to render [it] essentially at home in the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citation and internal marks omitted). "[A] corporation is generally 'at home' in its 'place of incorporation and principal place of business.'" *Chavez v. Dole Food Company, Inc.*, 836 F.3d 205, 223 (3d Cir. 2016) (*quoting Daimler AG*, 571 U.S. at 137.) Applying those principles, the Third Circuit recently observed that it is "incredibly difficult to establish general jurisdiction [over a corporation] in a forum *other* than the place of incorporation or principal place of business." *Id.* (*quoting Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)).

Here, there is no general personal jurisdiction against any of the Defendants. Specifically, neither MMI, GRI nor NAIC was incorporated anywhere in the United States, none of them maintains an office in this country, and none of them conducts any continuous or systematic business activities here. Accordingly, none of those entities is subject to general personal jurisdiction in this Court. *See, e.g.*, *Chavez*, 836 F.3d at 223 (no general jurisdiction against foreign company that "is not incorporated there, does not maintain an office there, and does not supervise its business there").

In a similar vein, Ms. MacKenzie does not reside anywhere in the United States. Accordingly, the Court also lacks general personal jurisdiction against him. *See, e.g.*, *Koch v. Pechota*, 744 F. App'x 105, 110 (3d Cir. 2018) ("[A]n individual is 'at home' where they are domiciled – in other words, an individual's 'true, fixed and permanent home and place of

habitation. It is the place to which, whenever he is absent, he has the intention of returning.'"

(*quoting McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006))).

### 3. *This Court Does Not Have Specific Jurisdiction Over Any of the Defendants.*

"Determining whether specific jurisdiction exists involves a three-part inquiry." *Kehm Oil Co.*, 537 F.3d at 300 (*citing O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007)). "First, the defendant must have 'purposefully directed his activities' at the forum." *Id.* (*quoting Burger King*, 471 U.S. at 472). Next, "the plaintiff's claim must 'arise out of or relate to' at least one of those specific activities." *Id.* (*quoting Helicopteros*, 466 U.S. at 414); *see also Deutz AG*, 270 F.3d at 150 ("Questions of specific jurisdiction are properly tied to the particular claims asserted."). Finally, the Court "may consider additional factors to ensure that the assertion of jurisdiction otherwise 'comport[s] with fair play and substantial justice.'" *Kehm Oil Co.*, 537 F.3d at 300 (*quoting Burger King*, 471 U.S. at 476). Importantly, the third prong of the Court's inquiry bears added significance where, as here, the out-of-state defendant is a resident of a foreign country. *See, e.g.*, *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

### (a) MMI

MMI has not directed or otherwise undertaken any activities whatsoever in the United States. (Ex. 1, MacKenzie Decl. ¶ 14.) More specifically, MMI has not entered into any contractual or other business relationships in the United States. (*Id.* ¶ 13.) No representative of MMI has made any representations, solicited any business or otherwise took any substantive steps to establish a business presence in the United States on MMI's behalf. (*Id.*) Nor has any MMI representative had any involvement with FSM's formation or operations on MMI's behalf.

(*see id.* ¶¶ 13-14.)  Mr. MacKenzie did not conduct any activities in or targeted towards the

United States in his capacity as MMI's president, board member or representative.  (*Id.* ¶ 14.)

As a consequence, there are simply no claims in the Complaint (nor could there be) that could

hypothetically arise out of or relate to any of MMI's (non-existent) activities in the United States.

Accordingly, it would be entirely unfair, unreasonable and unconstitutional for this Court to

exercise personal jurisdiction over MMI.

In fact, MMI's sole so-called "connection" to this dispute is its minority (i.e., 44%)

ownership stake in GRI, another Canadian entity, which owns FSM.  It is well established,

however, that a foreign defendant's ownership of a subsidiary corporation in the forum state does

not subject the foreign defendant to personal jurisdiction in the forum – even where the

subsidiary is *wholly owned* by the defendant.[11]  *See, e.g.*, *Kehm Oil Co.*, 537 F.3d at 301 ("The

mere fact that a subsidiary company does business within a state does not confer jurisdiction

over its nonresident parent, *even if the parent is sole owner of the subsidiary*." (emphasis added)

(citation omitted)).  MMI's connection is yet another step removed from that scenario, because it

does not own FSM and only holds a minority stake in GRI.  Accordingly, the Court lacks

specific jurisdiction over MMI.

---

[11]    The Trustee may also point to the fact that Mr. MacKenzie, who is MMI's president and board member, is also FSM's board member and president.  But the fact that an individual is employed by two separate corporate entities, one of which is subject to personal jurisdiction in this forum, does not confer personal jurisdiction in this Court over the foreign entity having no connection to this forum.  In particular, "a corporation can act only though its officers, employees, and other agents."  *Carmen Enters., Inc. v. Murpenter, LLC*, 185 A.3d 380, 391 n.15 (Pa. Super. Ct. 2018) (citation omitted).  Because personal jurisdiction must be premised on specific activities that "arise out of or relate to" the plaintiff's claim, and because Mr. MacKenzie engaged in no activities in or directed at the United States on MMI's behalf, his activities in this forum on FSM's behalf do not – and cannot – subject MMI to jurisdiction in this Court.

### (b)   GRI

For largely the same reasons as those applicable to MMI, the Court does not have specific personal jurisdiction over GRI.  Specifically, GRI's sole connection to the forum – and to this action – is its ownership of FSM and a handful of isolated contacts tenuously related to potential future activities.  As discussed above, however, GRI's ownership of FSM – even sole ownership – does not subject GRI to specific jurisdiction in this state.  *See Kehm Oil Co.*, 537 F.3d at 301. In a similar vein, GRI's retention of a New York-based bank to help fund the construction of a plant in Canada – and a handful of preliminary conversations the company's representatives had with several companies – bears no connection whatsoever to the Trustee's claims or to FSM. Stated differently, the mere fact that a foreign corporation has distant aspirations to build a manufacturing facility that will one day service customers in the United States (among other countries) cannot serve as a jurisdictional predicate for the Trustee's claims in a setting where the foreign corporation has not directed any meaningful activities towards the forum, the manufacturing plant is in its initial planning stages, and none of the corporation's activities relate in any manner to the Trustee's claim in the first instance.

Putting aside its ownership interest in FSM and the handful of isolated contacts described above, GRI has not directed or undertaken any other activities whatsoever in the United States. (Ex. 1, MacKenzie Decl. ¶¶ 21-22, 24-26.)  GRI has not entered into any other contractual or business relationships in the United States.  (*Id.* ¶ 22.)  Mr. MacKenzie did not conduct any other activities in or targeted towards the United States in his capacity as GRI's president, board member or representative relating to the management or operations of FSM.  (*Id.* ¶ 27.)  And, there are no substantive claims asserted by the Trustee that arise out of or relate to any of GRI's activities in the United States (except for GRI's ownership of FSM).  Accordingly, the Court cannot exercise personal jurisdiction over GRI either.

### (c)    NAIC

The Trustee fares equally poorly with respect to NAIC.  As discussed above, NAIC is Canadian corporation partially owned by GRI.  (*See* Ex. 1, MacKenzie Decl. ¶¶ 28-30.)  NAIC's sole connection to the United States (and FSM) was its third-party smelting arrangement with FSM.  (*Id.* ¶ 35.)  But that arrangement had nothing to do with any aspect of the Trustee's Complaint because the Trustee does not allege that NAIC violated any aspect of that arrangement.

Putting aside its contract with FSM, NAIC has not directed or otherwise undertaken any activities whatsoever in the United States.  (*Id.* ¶¶ 33-35.)  NAIC does not hold an ownership stake in FSM.  NAIC has no other contractual or business relationships in the United States.  (*Id.* ¶ 35.)  NAIC has not made any representations and has not solicited any other business in the United States.  (*Id.*)  NAIC has never had any involvement with FSM's formation or operations.  (*Id.* ¶ 36.)  Mr. MacKenzie did not conduct any activities in or relating to the United States in his capacity as NAIC's president or board member.  (*Id.* ¶ 37.)  Accordingly, the Court cannot exercise personal jurisdiction over NAIC.

### (d)    Mr. MacKenzie

Lastly, Mr. MacKenzie has no connection to – and has not undertaken any activities in – the United States (during at least the past 35 years), except for those he undertook solely in his capacity as FSM's president and board member.  (*See* Ex. 1, MacKenzie Decl. ¶¶ 4-8, 14, 21, 27, 37, 44.)  The law is clear that "a court does not have personal jurisdiction over an individual defendant whose only contacts with the forum state were taken in his or her corporate capacity." *United Prod. Corp. v. Admiral Tool & Mfg. Co.*, 122 F. Supp. 2d 560, 562 (E.D. Pa. 2000) (collecting cases); *accord in Re Commodore Int'l, Ltd.*, 242 B.R. 243, 252 (Bankr. S.D.N.Y. 1999) ("[A]n officer's presence in New York to conduct business for the [c]orporation does not

give us jurisdiction over the person individually." (citing cases)).  Accordingly, the Court does not have personal jurisdiction over Mr. MacKenzie either.

### 4. *The Trustee's Theory of Jurisdiction is Meritless.*

Likely aware that none of the Defendants has the requisite minimum contacts with the forum, the Complaint attempts to fabricate an "alter ego" jurisdictional predicate by reciting a series of bald legal conclusions and pointing to a handful of isolated, out-of-context statements from several documents.[12]  A plain reading of the Complaint and the materials referenced by the Trustee makes clear that those contentions have no factual or legal merit.

### (a) MMI, GRI and NAIC

The Complaint contains conclusory allegations seemingly intended to invoke the "alter ego" theory of personal jurisdiction against MMI, GRI and NAIC.  Pursuant to that theory, a foreign corporation may be subject to personal jurisdiction in the forum state if its domestic subsidiary is essentially acting as an "alter ego" of the foreign parent.  *See, e.g.*, *Savin Corp. v. Heritage Copy Prods., Inc.*, 661 F. Supp. 463, 468-69 (M.D. Pa. 1987).  It is important to note, however, that the "alter ego" theory of jurisdiction applies in very narrow circumstances and is exceedingly difficult to establish.  *See Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1098, 1104 (W.D. Pa. 1980) ("[E]stablishing an 'alter ego' relationship between parent and subsidiary for jurisdictional purposes is not an easy task."), *aff'd*, 752 F.2d 891 (3d Cir. 1985).

---

[12]   The Complaint's dearth of factual detail is particularly striking given that the Defendants have previously provided to the Trustee extensive documentation relating to FSM's business activities and its dealings with the corporate Defendants, and the Trustee has previously elicited nearly two hours of testimony from FSM's representatives.  In other words, the Trustee plainly had at her disposal the factual information necessary to articulate facts in support of the Complaint's legal conclusions, and the Trustee failed to do so.

The Third Circuit has explained the high burden faced by a plaintiff seeking to invoke alter ego jurisdiction:

> [W]here the corporate separation between a parent and subsidiary, "though perhaps merely formal," is "real" and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise.

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir. 1972) (*quoting Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925)).  To that end,

> if the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent and is not acting as merely one of its departments, personal jurisdiction over the parent corporation may not be acquired simply on the basis of the local activities of the subsidiary company.

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 317 (W.D. Pa. 2010) (citation omitted), *aff'd*, 683 F.3d 462 (3d Cir. 2012).

The Supreme Court's jurisprudence mandates such a high bar.  Specifically, the Court explained nearly 100 years ago that a foreign corporation's sole ownership of a domestic subsidiary – and the characteristics normally appurtenant to such ownership – cannot form the basis of alter-ego personal jurisdiction:

> Through ownership of the entire capital stock and otherwise, the defendant dominates the [domestic] corporation, immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the [defendant's] products in other States. The existence of the [domestic] company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the general [defendant] business was doubtless adopted solely to secure to the defendant some advantage under the local laws.

*Cudahy Packing Co.*, 267 U.S. at 335.

In determining whether a domestic subsidiary is the alter ego of its foreign parent, courts consider the following factors:

> (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance of business functions by the subsidiary which the principal corporation would normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation.

*Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005) (citations omitted).  "No single factor is dispositive, and the court may consider all relevant evidence to determine whether the parent exercises actual control over a subsidiary beyond that which is characteristic of a usual parent-subsidiary relationship." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 570 (M.D. Pa. 2009) (citations omitted); *accord Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830, 837 (E.D. Pa. 1997) ("[T]his Court believes that it should examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary to assess whether the contacts of the subsidiary with a particular state should be imputed to the parent.").

The Complaint fails to allege *any facts* that would permit this Court to exercise alter ego jurisdiction over MMI, GRI or NAIC, and the Complaint's scant allegations are otherwise inaccurate.  In particular, the Complaint includes a laundry list of conclusory statements intended to track the elements of an alter ego claim – i.e., that Defendants –

(i)  "controlled" Forks, (Compl. ¶¶ 13, 16, 23, 43, 44);

(ii)  "all have interlocking officers and directors," (*id.* ¶ 34);

(iii)  are "all involved in the same line of business" as FSM, (*id.* ¶ 35);

(iv)     treated FSM's assets as their own, (*id.* ¶ 42),

(v)      treated FSM as a "division" of their business, (*id.* ¶ 38),

(vi)     have "unified administrative control," (*id.* ¶ 43(b)),

(vii)    failed to "adequately fund" FSM, (*id.* ¶ 26), and

(viii)   induced "creditors" to rely upon their "representations" that FSM was a "division" of their business and "not a separate corporate entity," (*id.* ¶¶ 42, 47).

The Complaint's only additional detail consists of several phrases that the Complaint purports to quote from several documents attached to the Complaint.  (*See generally* Exs. C-G to Compl. (ECF 1-3 to -7).)  Nothing in those documents – and nothing in the Complaint as a whole – supports the Trustee's argument.

 *First*, there are no *facts* in the Complaint to support Trustee's conclusion that MMI, GRI or NAIC "controlled" FSM.  To be sure, GRI owns 100% of FSM's stock.  As discussed above, however, "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary."  *Kehm Oil Co.*, 537 F.3d at 301.  Moreover, "[c]ontrol of a subsidiary is not sufficient, in and of itself, to establish an alter-ego relationship."  *Savin*, 661 F. Supp. at 469 (citation omitted).  Rather, the plaintiff must establish that "the degree of control exercised by the parent [is] greater than normally associated with common ownership and directorship" and that "the parent controls the day-to-day affairs of the subsidiary, such that the subsidiary is merely a department of the parent."  *Id.* (citations omitted); *accord Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2005) (citations omitted).  The Complaint alleges no such facts.

 Further, the Complaint's allegation that "Defendants" "negotiated" or "executed" the Bill of Sale pursuant to which FSM purchased the two SAFs, (Compl. ¶¶ 9, 30), is precluded by the very documents the Complaint cites in support of that allegation.  Specifically, Exhibits A and B

to the Complaint make clear that the transaction at issue was formed solely between PADCED and FSM, and Mr. MacKenzie executed the Note solely in his capacity as FSM's president.  (*See* Ex. A to Compl. at 2 (ECF 1-1) & Ex. B to Compl. at 14, 18 (ECF 1-2).)  There is nothing in those documents – nor are there any *facts* in the Complaint – to support the conclusion that MMI, GRI, NAIC (or Mr. MacKenzie in his individual capacity) controlled or otherwise consummated that transaction.  Importantly, none of the Defendants signed a guaranty or any other documentation in connection with FSM's purchase of the SAFs (or any other transactions undertaken by FSM).  (Ex. 1, MacKenzie Decl. ¶ 43.)

*Second*, the Complaint's conclusory statement that MMI, GRI, NAIC and FSM "all have interlocking officers and directors" is factually inaccurate.  The fact of the matter is that Mr. MacKenzie is the *only* common director among those entities.  (*See supra* p. 5.)  And although Messrs. MacKenzie and Kemper and Ms. Tannous each have officer positions with each of the defendant entities and FSM, the numerous other officers of those corporations have no involvement or role whatsoever with FSM.  (*See* Ex. 1, MacKenzie Decl. ¶¶ 10, 19, 31, 46.)

*Third*, MMI, GRI, NAIC and FSM are *not* involved in the same line of business.  Again, none of MMI, GRI or NAIC has ever been engaged in the production of ferromanganese, none of them has extracted precious metals from e-scrap, and none of them has ever conducted operations as a third-party smelting facility.  (*See supra* pp. 8-9.)  Indeed, MMI, GRI and NAIC did not even operate any smelting facilities or furnaces between 2012 and 2017.  (*Id.*)  FSM, in turn, was never involved in the exploration, extraction, processing or manufacture of pig iron. (*Id.*)  In that respect, it is also important to note that FSM does not share any marketing materials (or logos) with MMI, GRI or NAIC.  (Ex. 1, MacKenzie Decl. ¶ 62; *see also* Corporate Logos of FSM, MMI, GRI and NAIC, attached as Exhibit 7.)

*Fourth*, none of MMI, GRI and NAIC has never "treated" FSM as its "division," nor has it treated FSM's assets as its own.  (Ex. 1, MacKenzie Decl. ¶ 68.)  The Complaint's factual support for those contentions – i.e., a handful of isolated quotes strung together from several unrelated documents – does not permit a conclusion to the contrary.  Specifically, Exhibit C to Trustee's Complaint is not "marketing material," nor does it reflect "representations" made by Defendants that "they were committed to provide the needed financing for the Debtor."  (Compl. ¶ 16.)  Rather, Exhibit C to the Complaint is an FSM business overview document prepared by FSM in 2013 solely for internal use.  (Ex. 1, MacKenzie Decl. ¶ 70.)  No copies of that document were provided to the PACDED or any other entity in the United States.  (*Id.*)  More fundamentally, the document as a whole plainly describes, in granular detail, FSM's own, independent business plan and strategy and makes clear that FSM intended to conduct profitable operations on a long-term basis.  (*See generally* Ex. C to Compl. (ECF 1-3).)  GRI's role in founding FSM and providing it with certain equipment and capital to commence its operations is "no more than what would be expected" from any sole owner of such an entity.  As such, that document actually precludes the Trustee's contention that FSM is the "alter ego" of any of the other corporate defendants.

The Complaint also points to Exhibit D to the Complaint, which is a letter sent by GRI to a third party in 2015, as support for the conclusion that "GRI entered into transactions utilizing assets of the Debtor as if they were GRI assets."  (Compl. ¶ 17.)  The Trustee's contention is precluded by a plain reading of the letter itself.  Specifically, Exhibit D is a (non-binding) letter of intent sent by GRI to Elemental Recycling, LLC, a third-party entity, reflecting GRI's discussions regarding the contribution of its 100% ownership stake in FSM (as it is indisputably

entitled to do) toward a new joint venture for the purpose of e-scrap smelting and precious metal recycling.  (Ex. D to Compl. at 1 (ECF 1-4).)

The potential transaction reflected in Exhibit D was never consummated.  (Ex. 1, MacKenzie Decl. ¶¶ 71-72.)  The letter itself was never distributed to anyone other than its intended recipient.  (*Id.* ¶ 72.)  Elemental Recycling, LLC ultimately did not enter into any business dealings or relationships with FSM or GRI, (*id.*), and Elemental Recycling, LLC is not a creditor in this bankruptcy.  In short, nothing in Exhibit D reflects any effort by GRI to "utilize FSM's assets as its own" or to exercise any level of control beyond that which is customary for an owner of a company's equity.

The Complaint next points to what it terms an "investment teaser" dated January 2017, attached as Exhibit E to the Complaint, as support for the contention that "GRI and NAIC marketed [FSM's] assets as if [FSM's] assets belonged to them."  (Compl. ¶ 18 & Ex. E to Compl. (ECF 1-5).)  That document does not support the Trustee's contention either. Specifically, the document attached as Exhibit E to the Complaint was used by FSM in connection with its effort to solicit strategic partners for its business.  (Ex. 1, MacKenzie Decl. ¶ 73.)  That document describes a prospective business relationship that FSM was pursuing as of early January 2017, and it otherwise sets forth FSM's plans to extract precious metals from automotive catalytic converters.  (*Id.*)  FSM was ultimately unable to attract any such partners, and the prospective business relationship reflected in that document did not materialize.  (*Id.*) The *only* references in the document to GRI or NAIC are in the "Background" section, wherein FSM describes its origins (i.e., as a wholly owned subsidiary of GRI) and its business relationship with NAIC (i.e., as a third-party smelting facility, pursuant to a separate

arrangement).  (Ex. E to Compl. at 2 (ECF 1-5).)  Those references in no way support Trustee's

alter ego jurisdiction claim.

The Complaint next proclaims that "Defendants" "so dominated" FSM that they excluded

FSM from a non-disclosure agreement between GRI, NAIC and WoodsWater Capital, Inc.

relating to that entity's potential purchase of GRI's stake in FSM.  (Compl. ¶ 19.)  In that

instance, the Complaint curiously omits any supporting documentation.  That contention is

factually inaccurate as well, however.  Specifically, FSM entered into exclusive discussions with

WoodsWater Capital, Inc. in 2014 regarding a potential transaction whereby WoodsWater

Capital, Inc. would make an equity investment in FSM's business.  (Ex. 1, MacKenzie Decl.

¶ 69(i).)  In connection with those discussions, *FSM and WoodsWater Capital, Inc.* signed an

Exclusivity Agreement on July 21, 2014 to allow WoodsWater Capital, Inc. to complete a review

of FSM's business.  (*See* Exclusivity Agreement between FSM and WoodsWater Capital, Inc.,

July 21, 2014, attached as Exhibit 8.)  Kevin Kemper signed that document on FSM's behalf.

(*Id.* at 2.)  Neither GRI nor NAIC were parties to that agreement.[13]

The Complaint next references a statement contained in the "About Metalo

Manufacturing Inc." section of MMI's notice of special shareholders' meeting dated December

5, 2017, attached as Exhibit F to the Complaint, which reads, "FSM is currently used as a testing

facility for iron smelting."  (Compl. ¶ 39 & Ex. F to Compl. (ECF 1-6).)  Once again, the quoted

statement in no way supports the Trustee's alter ego theory of jurisdiction.

---

[13]     The non-disclosure agreement referenced by the Complaint was an entirely separate
agreement signed among WoodsWater Capital, Inc., GRI and NAIC to ensure that WoodsWater
Capital, Inc. maintained the confidentiality of any non-public documents it obtained *regarding
those entities* during its due diligence process.  (*See* Non-Disclosure and Confidentiality
Agreement among GRI, NAIC and WoodsWater Capital, Inc., July 21, 2014, attached as Exhibit
9.)  It is entirely disingenuous for the Trustee to suggest that FSM should have been a party to, or
was otherwise "excluded" from that agreement, let alone that its exclusion was the result of
GRI's or NAIC's "domination" of FSM.

Lastly, the Complaint references a single slide from a larger PowerPoint presentation made by MMI to its shareholders in 2015.  (Compl. ¶ 40 & Ex. G (ECF 1-7).)  That slide does not support the Complaint's contention that MMI reported to its shareholders in 2015 that it "owned" FSM's facility.  Rather, the slide is simply a reference to the feasibility tests then being conducted by FSM for NAIC, which were being performed by FSM pursuant to the separate arrangement between those parties – an arrangement that generated revenues for FSM of more than $5.14 million over the course of FSM's existence, which were used to pay the company's costs and expenses as they became due.  (*See supra* pp. 6-8.)

*Fifth*, the Complaint's contention that Defendants have "unified administrative control" has no factual support either.  As discussed above, FSM's day-to-day operations were conducted by Messrs. O'Connor and McKinney – i.e., FSM's two employees who were located at FSM's own, dedicated facility in Easton, Pennsylvania.  (*See id*.)  Those individuals had no employment or other relationships with MMI, GRI or NAIC.  (*Id*.)  FSM maintained separate corporate records, bank accounts and insurance policies, and the company filed its own tax returns.  (*Id*. at 8.)

*Sixth*, the Complaint's contention that Defendants failed to "adequately fund" FSM is entirely conclusory and otherwise meritless.  At the outset, neither MMI nor NAIC had any ownership interest in FSM, and they did not have any obligation to "fund" FSM's operations. Further, FSM conducted operations for five full years, generating revenues sufficient to pay its expenses and liabilities in the ordinary course of business.  (*See supra* pp. 6-9 & Ex. 4.)  The company's internal financial statements and tax returns reflect as much.  (*See id.* & Ex. 6.)

*Finally*, the Complaint baldly declares that MMI, GRI and NAIC fraudulently misled FSM's "creditors."  (*See, e.g.*, Compl. ¶ 20.)  Once again, however, the Complaint is entirely

devoid of any factual allegations as to the identity of any "creditors" that were "misled"; when, how and by whom they were misled; what actions they allegedly took in reliance on any such alleged misrepresentations; or what any of the defendants allegedly gained as a result. *See generally Car Sense, Inc. v. Am. Special Risk, LLC*, 56 F. Supp. 3d 686, 695 (E.D. Pa. 2014) ("The elements of fraudulent misrepresentation under Pennsylvania law are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.").

In sum, the Complaint's laundry-list of conclusory contentions falls woefully short of establishing a *prima facie* case of alter ego jurisdiction against *any* of the Defendants – let alone all of them.  In fact, courts routinely reject claims of alter ego jurisdiction against foreign parents who exercise a level of control, involvement or overlap that simply does not exist here.  For example, in *Savin Corp. v. Heritage Copy Products, Inc.*, the plaintiff brought suit against a domestic company and asserted the alter ego theory of personal jurisdiction against its Canadian parent, a holding company.  *See* 661 F. Supp. 463, 469 (M.D. Pa. 1987).  As support for its argument, the plaintiff cited to the following facts: (i) statements by the parent company evidencing an intent to control the subsidiary, (ii) the parent company's ownership of the majority of the subsidiary's stock; (iii) overlap between the parent's and subsidiary's officers and directors; (iv) control over the subsidiary's operations by the parent's executives; (v) the parent's financial support to the subsidiary to meet the subsidiary's operating expenses; (vi) the parent's filing of consolidated financial statements that included the subsidiary; and (vii) the parent's use of the subsidiary's offices for one of the parent's employees.  *Id.* at 469-71.  After considering

"the totality of the evidence submitted by" the plaintiff, the court concluded that plaintiff failed to meet its burden of establishing the existence of an alter-ego relationship. *Id.* at 471.

The court reached the same conclusion in *Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830 (E.D. Pa. 1997). There, the plaintiffs alleged jurisdiction over a foreign parent on the grounds (among others) that its domestic subsidiary was its alter ego. *Id.* at 834. As support, the plaintiffs alleged that the foreign parent "originates, implements, directs, controls, manages, supervises and polices its [domestic subsidiary's] operations on a day-to-day basis." *Id.* at 837.

Rejecting the plaintiffs' contentions, the Court concluded that "the relationship between [the foreign parent] and [the domestic subsidiary] is that of an ordinary holding company/subsidiary relationship, not one of undue domination and control." *Id.* at 837-38. As support for its conclusion, the Court noted that (i) the two companies "have operated as separate and distinct corporate entities," with each having "its own offices, employees, directors and officers, . . . accounts, records and minutes"; (ii) the foreign parent provided its subsidiary "with substantial autonomy" insofar as the subsidiary "was responsible for managing its own . . . operations" and "prepared its own plans, estimates, and performance results"; and (iii) transactions between the parent and the subsidiary were conducted on terms applicable to arms' length transactions. *Id.* at 838-39.

The Court also rejected plaintiffs' claim that overlap between the two companies' directors or officers supported a finding of alter ego jurisdiction, explaining that "overlapping directors and officers do not alone establish an alter ego relationship." *Arch*, 984 F. Supp. at 838; *see also Poe v. Babcock Int'l, plc.*, 662 F. Supp. 4, 6 (M.D. Pa. 1985) (rejecting claim of alter ego jurisdiction and noting, "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are

common to the boards of both").  The court likewise rejected as unsupported by any evidence

plaintiffs' conclusory contention that the subsidiary was "insolvent" or that the parent "drained"

its profits.  984 F. Supp. at 839-40.

Other cases are in accord.  *See, e.g.*, *Clark v. Matsushita Elec. Indus. Co.*, 811 F. Supp.

1061, 1067-70 (M.D. Pa. 1993) (finding no alter ego jurisdiction existed over parent company

that wholly owned the subsidiary, had one director in common with subsidiary, used subsidiary

as its exclusive U.S. distributor, and "lump[ed] together" subsidiary's financial information into

parent company's annual report); *Indian Coffee Corp.*, 482 F. Supp. at 1104 (rejecting claims of

alter ego jurisdiction over parent company based on evidence that the "directors, board meetings,

shareholder meetings, records, accounts, tax returns, and decisions concerning day-to-day

operations of its two subsidiaries . . .  [were] entirely separate from [the parent company]."),

*aff'd*, 752 F.2d 891 (3d Cir. 1985).

### (b)   Mr. MacKenzie

There is no basis for the Court to exercise personal jurisdiction over Mr. MacKenzie

either.  As discussed above, "a court does not have personal jurisdiction over an individual

defendant whose only contacts with the forum state were taken in his or her corporate capacity."

*United Prod. Corp.*, 122 F. Supp. 2d at 562 (citations omitted) (collecting cases).  There are two

narrow exceptions to that rule: "when the corporate officer is charged with (1) committing a tort

in his corporate capacity or (2) violating a statutory scheme that provides for personal, as well as

corporate, liability for corporate actions."  *Id.*  Neither of those exceptions apply here.

At the outset, the Complaint does not assert any statutory theories of liability against

Mr. MacKenzie that provide for personal liability for corporate actions.  In an apparent effort to

fit this case within the first exception, the Complaint alleges, in wholly conclusory manner, that

Mr. MacKenzie (i) "entered into significant transactions in Pennsylvania and directed numerous

communications to the forum"; (ii) "took active part in the commission of the foregoing

misrepresentations"; and (iii) "breached his fiduciary duties owed to [FSM's] creditors by

ceasing to fund [FSM]."  (Compl. ¶¶ 14, 68, 69.)  None of those conclusory allegations have any

factual detail, support or merit.

There are no "transactions" described in the Complaint that Mr. MacKenzie "entered" in

his personal capacity, and as discussed above, actions that Mr. MacKenzie took in his role as

president of FSM (or any other entity, for that matter) do not subject him to personal jurisdiction

in this Court.  Second and also as discussed above, the Complaint contains no factual details of

any "misrepresentations" made by any of the other corporate Defendants, nor does the Complaint

set forth any of the other elements of a fraud claim.[14]  (*See supra* pp. 26-27.)  Third, there is

simply no factual or legal basis for the Trustee's conclusion that Mr. MacKenzie "owed fiduciary

duties" to FSM's debtors, or that he was obligated to "fund" FSM as part of any such fiduciary

obligation.  In sum, there is no basis whatsoever for the Court to exercise personal jurisdiction

over Mr. MacKenzie.

**B.     The Complaint Fails to State a Cognizable Claim for Relief.**

In addition to its jurisdictional deficiencies, the Complaint should be dismissed pursuant

to Rule 12(b)(6) because it fails to state a claim upon which relief can be granted.

*1.     Legal Standard*

"Because Federal Rule of Civil Procedure 8(a)(2) 'requires a "showing," rather than a

blanket assertion, of entitlement to relief,' courts evaluating the viability of a complaint under

Rule 12(b)(6) must look beyond conclusory statements and determine whether the complaint's

---

[14]     Indeed, if the Complaint had asserted a misrepresentation claim (which it does not), such
a claim would be subject to dismissal under Fed. R. Civ. P. 9(b).  Under Rule 9(b), "[i]n alleging
fraud or mistake, a party must state with particularity the circumstances constituting fraud or
mistake."  *Id.*

well-pled factual allegations, taken as true, are 'enough to raise a right to relief above the speculative level.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 & n.3 (2007)).  As the U.S. Supreme Court explained in *Iqbal*, the pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Id.* (citation omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (citation omitted).  Finally, in evaluating a motion to dismiss under Rule 12(b)(6), the Court should ignore "unsupported conclusions and unwarranted inferences," or "a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

### 2.      *The Complaint Contains No Facts Supporting a Veil-Piercing Claim.*

"There is a strong presumption in Pennsylvania against piercing the corporate veil." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1277 (Pa. Super. Ct. 2004) (citation omitted).  As the Pennsylvania Supreme Court has explained, "any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. . . .  Care should be taken on all occasions

31

to avoid making the entire theory of the corporate entity . . . useless." *Wedner v. Unemployment Board*, 296 A.2d 792, 794 (Pa. 1972) (citation and internal marks omitted). Courts consider the following factors when determining whether to pierce the corporate veil: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs, and (4) use of the corporate form to perpetrate a fraud." *Lomas v. Kravitz*, 130 A.3d 107, 126 (Pa. Super. Ct. 2015) (citation omitted), *aff'd*, 170 A.3d 380 (Pa. 2017). Importantly, "Pennsylvania law requires that a veil-piercing claim be 'supported by specific factual averments, rather than mere legal conclusions.'" *Shenango Inc. v. Am. Coal Sales Co.*, No. 2:06-CV-149, 2007 WL 2310869, at *3 (W.D. Pa. Aug. 9, 2007) (citations omitted).

As discussed above, the Complaint's veil-piercing allegations against MMI, GRI and NAIC consist of (i) a list of bare legal conclusions framed in the form of factual allegations; and (ii) references to a handful of attached documents that do not support the propositions for which they are cited. (*See generally* pp. 19-24.) Even on their face, the Complaint's allegations fail to set forth the basic factual contours of a legally cognizable claim.

Specifically, the Complaint contains no *facts* permitting the inference that FSM was, in fact "undercapitalized," nor does the Complaint provide any factual basis for the conclusion that FSM "failed to adhere to corporate formalities." Further, there are no factual allegations that the various Defendants "intermingled" their affairs with those of FSM, or that any of them used FSM to "perpetrate a fraud." There are no allegations regarding the time, place or the specific actions taken by each Defendant, how or why any such conduct took place in each Defendant's extra-corporate capacity, or how the relationships between or among the various parties justify veil-piercing.

Where, as here, a plaintiff's complaint does nothing more than recite the legal elements

of a veil-piercing claim, courts consistently dismiss such claims under Rule 12(b)(6).  For

example, in *Partners Coffee Co., LLC v. Oceana Services & Products Co.*, the court dismissed a

corporate veil-piercing claim that "consist[ed] of nothing more than a list of the factors

identified" as part of a veil-piercing analysis.  700 F. Supp. 2d 720, 737 (W.D. Pa. 2010).  In so

doing, the court concluded that "[t]his Court is 'not compelled to accept unsupported conclusions

and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Id.* at 737-38

(citation omitted).

In *Essex Insurance Co. v. Miles*, the court likewise dismissed a corporate-piercing claim

premised upon "a formulaic recitation of the elements of [the] cause of action."  No. CIV.A. 10-

3598, 2010 WL 5069871, at *3 (E.D. Pa. Dec. 3, 2010) (citation omitted).  As the *Essex* court

noted, "[r]eliance by [the plaintiff] on information and belief cannot transform legal conclusions

into plausible factual allegations." *Id.* (citation omitted).

The court reached the same conclusion in *Shenango Inc.*, 2007 WL 2310869.  There, as

here, the complaint contained "no recitation of any facts regarding the time, place or manner of

actual conduct that would support the [plaintffs'] conclusions." *Id.* at *2.  The court observed,

for instance, that "although plaintiffs allege that [the corporate defendant] was undercapitalized,

[the complaint] does not identify any facts about its finances, its relationship with its sister

companies, or any other specifics." *Id.*  Further, the court explained that plaintiffs failed to plead

"facts sufficient to support its claim that [an individual defendant] acted in a personal capacity

rather than in his role as an executive of [defendant corporations], such that the corporate veil

should be pierced." *Id.* at *4; *see also id.* ("[A]verments reciting elements of the veil-piercing

test, without any supporting facts, constitute legal conclusions. . . .  Simply alleging [personal

defendant's] ownership and control over the corporations is 'irrelevant and immaterial,' because a Pennsylvania corporation is strongly presumed to be independent even if owned by one person." (citation omitted)).

In sum, because the Complaint fails to allege any *facts* that would support a veil piercing claim (or any other claim), it should be dismissed in its entirety and with prejudice.[15]

## IV.    CONCLUSION

The Due Process Clause of the U.S. Constitution imposes strict and specific constraints on this Court's ability to exercise personal jurisdiction over a foreign defendant.  And, as the Supreme Court explained, "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  *Asahi Metal Indus. Co.*, 480 U.S. 115.  The Trustee's Complaint utterly fails to establish such a jurisdictional predicate here. Indeed, if Trustee's conclusory and scatter-shot allegations were sufficient to hale the four Defendants into this Court, the strictures of the Due Process clause would be reduced to a rubber stamp, and any plaintiff could wield this Court's personal jurisdiction power simply by including in the complaint a conclusory recitation of the legal elements of a veil-piercing claim.  But that is not the law.  Accordingly, because this Court's exercise of personal jurisdiction over any of the Defendants would plainly offend "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co.*, 480 U.S. 113, the Court should dismiss the Complaint in its entirety.

---

[15]    Because the Complaint contains no legal counts whatsoever and otherwise lacks any indication regarding which claims are being asserted against each of the Defendants, the Defendants reserve the right to address as part of their reply any other additional legal claims that the Trustee attempts to assert or identify as part of its response to this motion.

Respectfully submitted,

COHEN & GRIGSBY, P.C.

By:   s/Fridrikh V. Shrayber
          Fridrikh V. Shrayber (Pa. I.D. No. 208083)
          Katie R. Jacobs (Pa. I.D. No. 307385)
          (admission *pro hac vice* forthcoming)
625 Liberty Avenue
Pittsburgh, PA  15222-3152
Ph:  (412) 297-4900 / Fax:  (412) 209-0672
fshrayber@cohenlaw.com
kjacobs@cohenlaw.com

Attorneys for Defendants
Metalo Manufacturing Inc., Grand River Ironsands
Incorporated, North Atlantic Iron Corporation,
and Francis MacKenzie

Dated:  July 18, 2019
3072041.v1