**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| Forks Specialty Metals Inc., | ) Case No. 17-18601-mdc |
| | ) |
| Debtor. | ) |
| | ) |
| Lynn E. Feldman, Esquire, Trustee | ) |
| For the Estate of Forks Specialty Metals | ) Adversary No. 19-00028-mdc |
| Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Grand River Ironsands Incorporated, | ) |
| North Atlantic Iron Corporation, | ) |
| Metalo Manufacturing Inc. f/k/a | ) |
| Muskrat Minerals Incorporated, and | ) |
| Francis MacKenzie, | ) |
| | ) |
| Defendants. | ) |

<u>**TRUSTEE'S OBJECTION TO DEFENDANTS' MOTION TO DISMISS**</u>

Plaintiff, Lynn E. Feldman, Chapter 7 Trustee (the "Trustee") for the estate of Forks Specialty Metals Inc. (the "Debtor" or "FSM"), by and through her counsel, Gellert Scali Busenkell & Brown LLC, as and for her Objection to the Defendants' Motion to Dismiss, , limited to the factual circumstances alleged in and surrounding the Defendants' Motion to Dismiss, respectfully represents as follows:

1.      This adversary proceeding is commenced pursuant to Part VII of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") seeking determinations that:

a. the corporate forms of the Debtor Corporations, Grand River Ironsands Incorporated ("GRI"), North Atlantic Iron Corporation ("NAIC"), Metalo Manufacturing Inc. f/k/a formerly Muskrat Minerals Incorporated ("MMI"), be disregarded to the full extent of claims in this estate;

b. the corporate veil of Debtor Corporation be pierced such that the assets of Grand River Ironsands Incorporated ("GRI"), North Atlantic Iron Corporation ("NAIC"), and Metalo Manufacturing Inc. f/k/a formerly Muskrat Minerals Incorporated ("MMI") are considered assets of Debtor Corporation's estate for all intents and purposes;

c. the assets of Defendants Grand River Ironsands Incorporated ("GRI"), North Atlantic Iron Corporation ("NAIC"), Metalo Manufacturing Inc. f/k/a formerly Muskrat Minerals Incorporated ("MMI") be considered assets of Debtor Corporation's estate for all intents and purposes; and

d. a money judgment be entered against the Defendants in favor of the Trustee for all the claims of the estate including administrative fees and costs; and

e. defendants intentionally represented that the debtor was a division or part of their overall enterprise, but ultimately breached duties owed the debtor and its creditors; and

f. other related relief.

2.    The Debtor is a Pennsylvania corporation formed on November 2, 2012 by Defendants. Defendants specifically and intentionally formed the Debtor as a testing facility, research and development facility and division for their business operations. The Debtor

provided the testing required by Defendants until just prior to the bankruptcy filing. The Debtor was never properly capitalized and was from its inception insolvent.

3.       Specifically, GRI formed the Debtor to provide services to NAIC. In the history of its entire existence, nearly all of the Debtor's work product was done at the request of its owner, GRI, for the benefit of NAIC.

4.       The foregoing establishes that the Defendants GRI and NAIC directed conduct occurring in Pennsylvania by Debtor, conducted business in Pennsylvania through the Debtor and caused economic losses and harm in the state such that there are minimum contacts with Pennsylvania sufficient to enable the bankruptcy court to exercise jurisdiction over them. Francis MacKenzie, in his individual and corporate capacity, entered into significant transactions in Pennsylvania and directed numerous communications to the forum. He traveled frequently into the state. Defendants also engaged in a transaction that created rights and obligations among citizens of the forum and resulted in significant ties with the forum. The Defendants broadly advertised their presence in the forum through their ownership and control of the Debtor. Thus, Defendants deliberately and personally directed significant activities toward the state.

5.       The court has already determined that it has jurisdiction over Mr. MacKenzie. Mr. MacKenzie's purposeful availment in the Commonwealth on his own behalf was also on behalf of defendants GRI, NAIC and MMI.

6.       The Debtor and defendants GRI, NAIC and MMI all have interlocking officers and directors including Francis MacKenzie, Kevin Kemper, Jean-Marc MacKenzie, Albert LeBlanc and Lina Tannous. Defendant NAIC widely marketed that it owned, operated or controlled Debtor Forks Specialty Metals Inc. ("FSM") a wholly owned subsidiary of GRI, i.e., that it owns, operates and controls the two smelting furnaces of the Debtor in Pennsylvania,

USA. Marketing materials utilized by Defendants evidence that Defendants treated the corporate assets of the Debtor as if they were the Defendants' own property. In all aspects of their business, the Defendants functioned with the Debtor as a single entity.

7.     Defendants have filed a Motion to Dismiss the Trustee's Complaint for lack of personal jurisdiction and failure to state a claim on behalf of all Defendants.

8.     In their motion to dismiss, Defendants labor to trivialize Plaintiffs' allegations regarding Defendants' interrelatedness, their activities directed at the forum state and the economic injuries they have caused the Debtor and the creditors of the bankruptcy estate.

9.     In attempting these feats, Defendants ignore key admissions and attempt to recast the factual allegations in Plaintiffs' complaint.

10.     The factual allegations in Plaintiffs' complaint—which must be presumed to be true at this stage—speak largely for themselves:

a.  On December 28, 2017 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

b.  On December 28, 2017, Lynn E. Feldman was appointed the Chapter 7 Trustee by the United States Trustee.  She became the permanent trustee at the conclusion of the meeting of creditors.

c.  The Debtor is a Pennsylvania corporation formed on November 2, 2012 by Defendants.

d.  The Debtor was never solvent.

e.  Pursuant to the terms of a Bill of Sale, negotiated by Defendants, dated November 8, 2012, the Pennsylvania Department of Community and Economic Development ("DCED"), on November 30, 2012, made a sale of

industrial equipment to Forks Specialty Metals Inc. at the original agreed upon amount of $1,600,000 (the "Loan"), which is evidenced by a Bill of Sale and a Note.

f.  The Pennsylvania Department of Community and Economic Development's mission is to encourage the shared prosperity of all Pennsylvanians by supporting good stewardship and sustainable development initiatives across our commonwealth.

g.  On the Petition date, the Debtor's Loan with the DCED was in default, with the amount of $1,201,599.16 owed to The Pennsylvania Industrial Development Authority ("PIDA") as of December 28, 2017.

h.  Defendants specifically and intentionally formed the Debtor as a testing facility, research and development facility and division for their business operations.

i.  The Debtor provided the testing required by Defendants until just prior to the Petition Date.

j.  Debtor was wholly owned, controlled and operated by Defendants.

k.  The Defendants have had the minimum contacts with Pennsylvania that are necessary to permit the bankruptcy court to exercise jurisdiction over them.

l.  Francis MacKenzie, in his individual and corporate capacity, entered into significant transactions in Pennsylvania and directed numerous communications to the forum.

m.  Defendants also engaged in a transaction that created rights and obligations among citizens of the forum and resulted in significant ties with the forum.

n.  Thus, Defendants deliberately and personally directed significant activities toward the state.

o.  The Debtor was formed as part of an affiliated group or enterprise by Defendants and all members of the "enterprise" must be treated as one legal entity with the entire enterprise liable for the debts of any member of the group.

p.  The Debtor was treated as the mere instrumentality of the Defendants enterprise and was always under their complete control and domination.

q.  In marketing materials dating back to 2013, Defendants represented that they were committed to provide the needed financing for the Debtor:

r.   In addition, GRI entered into transactions utilizing assets of the Debtor as if they were GRI assets:

s.  GRI and NAIC marketed the Debtor's assets as if the Debtor's assets belonged to them:

t.  The Defendants so dominated Debtor that when Defendants sought to sell an interest in the Debtor to WoodsWater Capital Inc., NAIC and GRI entered into a non-disclosure agreement with the potential buyer but the Defendants did not include the Debtor in the agreement.

u.  The Defendants' control over their Debtor subsidiary and representations regarding their support were used to commit fraudulent, wrongful or unjust acts against the Debtor's creditors.

v.  The creditors were harmed as a result of the fraudulent, wrongful or unjust acts of Defendants.

w. The Debtor's books and records were maintained by Defendants in Halifax, Nova Scotia, Canada.

x. The Defendants purposefully directed and controlled the operations of Debtor from Canada.

y. Defendants failed to provide the Debtor with capital sufficient to carry on any business other than their own need for testing, research and development.

z. Debtor was insufficiently capitalized resulting in its inability to pay its debts as they became due despite the creation of the Debtor for the sole benefit of Defendants.

aa. Defendants knew or should have known that the Debtor was inadequately capitalized.

bb. Defendants commingled parent and subsidiary assets.

cc. Corporate formalities were not generally observed with respect to the Debtor subsidiary.

dd. Francis MacKenzie is the President and Director of FSM, President and Director of Grand River Ironsands since 2007; a company whose majority shareholder is Metalo Manufacturing Inc. (CSE:MMI) of which Mr. MacKenzie is also the President.

ee. Francis MacKenzie signed the Bill of Sale and Note with the DCED.

ff. Grand River Ironsands Incorporated (GRI) was established in 2007 as a private company based in Nova Scotia, Canada.

gg. Metalo Manufacturing Inc. ("MMI") is a 44% shareholder of Grand River Ironsands Incorporated ("GRI").

hh. GRI owns a 60% interest in North Atlantic Iron Corporation ("NAIC").

ii. As explained in detail at the meeting of creditors, the Debtor, GRI, NAIC and MMI all have interlocking officers and directors including Francis MacKenzie, Kevin Kemper, Jean-Marc MacKenzie, Albert LeBlanc and Lina Tannous.

jj. The Defendants and Debtor are all involved in the same line of business.

kk. NAIC's business emphasis was to use the Debtor's plant for the manufacturing of pig iron.

ll. NAIC widely marketed that it owned, operated or controlled Debtor Forks Specialty Metals Inc. ("FSM") a wholly-owned subsidiary of GRI, i.e. that it owns, operates and controls the two smelting furnaces of the Debtor in Pennsylvania, USA.

mm.    Prior to the petition date, the Debtor FSM was engaged in and was used as a testing facility of Defendants used for iron smelting.  It was used for no other significant purpose.

nn. From 2012 to present, Defendants widely marketed their interest in FSM as:

oo. "GRI also owns Forks Specialty Metals - the testing facility for all of NAIC's demonstration level smelting campaigns in the United States" and "Forks Specialty Metals Inc. ("FSM") is a wholly- owned subsidiary of GRI and it owns and operates three smelting furnaces in Pennsylvania, USA. FSM is currently used as a testing facility for iron smelting."

pp. MMI reported to its shareholders on December 8, 2015 that it "owned" the Debtor's facility in Forks, Pennsylvania.

qq. These marketing materials evidence that Defendants treated the corporate assets of the Debtor as if they were the Defendants' own property.

rr. Creditors of FSM relied on Defendants' representations that FSM was a division of Defendants, an integral component of the overall enterprise and not a separate corporate entity.   They had no reason to believe that they were dealing with a separate entity due to the representations and control exhibited by Defendants.

ss. In all aspects of their business, the Defendants functioned with the Debtor as a single entity and should be treated as such.

tt. GRI was the sole shareholder of Debtor, it controls NAIC and is controlled by MMI.

uu. The marketing materials indicate the Defendants share employees with the Debtor, prepare consolidated financial statements and tax filings with the Debtor, and operate as a consolidated unified administrative unit with the Debtor.

vv. The defendants perform supplementary business functions with the debtor.

ww.   Injustice is caused to the Commonwealth and creditors of this bankruptcy estate by defendants stopping funding for the Debtor, turning over all Debtor's assets to the landlord and filing for bankruptcy.

xx. There are no or inadequate corporate records maintained by the Debtor.

yy. Any records that do exist are located at the offices of Defendants and never at the Debtor's location.

zz. No shareholders' meetings were held by Debtor.

aaa.    There are no minutes of any shareholder meetings of Debtor.

bbb.    The financial information of the Debtor was consolidated with that of the Defendants.

ccc.    Defendants had a duty to maintain the books and business records for Debtor.

ddd.    Defendants dominated and controlled the activities and business decisions of Debtor.

eee.    Debtor is indistinguishable from the shareholder.

fff. Defendants operated Debtor for their own exclusive benefit.

ggg.    No dividends were paid by Debtor.

hhh.    Debtor was insolvent.

iii. Debtor was grossly undercapitalized.

jjj. Debtor never generated any revenue from its operations and was not operated in such a manner as to provide services or benefit to any companies other than the defendant companies.

kkk.    Defendants always used the assets of the Debtor's business as if those assets were their own.

lll. As to the general public, the fact of the existence of Debtor as a separate going concern was not made apparent.

mmm. Utilization of the assets of Debtor and its operations were solely for the direct benefit of Defendants.

nnn.    Francis Mackenzie, a corporate officer of Debtor and agent of the other business Defendants, took active part in the commission of the foregoing misrepresentations and is personally liable therefor.

ooo.    Francis Mackenzie, a corporate officer of Debtor and as agent of the other business Defendants, breached his fiduciary duties owed the Debtor's creditors by ceasing to fund the Debtor.

ppp.    Francis Mackenzie's conduct as agent for the Defendants and Debtor creates joint and several liability among the Defendants for breach of fiduciary duties owed.

qqq.    The Defendants and the Debtor share common ownership and were operating with Mr. McKenzie as a corporate combine.

rrr.  The Defendants with Debtor acted as a single entity or as an enterprise entity.

sss. The Debtor was created to take over a function of the original economic entity of Defendants thus fulfilling a similar or supplementary business function.

ttt. Indeed, the Defendants often referred to the Debtor as a "division" in their publications.

uuu.    The Debtor conducted tests for NAIC for which it received no or insufficient compensation.

vvv.    The Debtor's books and records reflect that at least $133,000 was specifically owed by NAIC to Debtor for services provided but not paid for as of the Petition Date.

www. Defendants and/or entities controlled by Defendants had an interest in and/or received benefits and/or services from Debtor.

xxx.   Defendants substantially benefited at the expense of the estate of Debtor, and Debtor's creditors.

yyy.   The Debtor and Defendants were involved in a program of misrepresentation whereby assets were combined, comingled and transferred and services were provided to the Defendants in a series of mutual and complicated account transactions and transfers. The primary purpose of the program was to utilize assets of the Debtor for the sole benefit of the Defendants but to the detriment of Debtor's creditors.

11.   The Trustee's investigation, including the testimony of Mr. MacKenzie, Ms. Tannous and Mr. LeBlanc at the 341(a) meeting of creditors (see D.I. 25) prior to filing the complaint, established:

a.   MMI has a controlling interest in GRI.

b.   GRI has controlling interests in the Debtor and in NAIC.

c.   MMI acted as the investor holding company for GRI which operated both the Debtor and NAIC.

d.   MMI had no function other than to act as the holding company for GRI.

e.   Substantially all the work done by the Debtor in its entire history was done for the benefit of NAIC and GRI.

f.   The Debtor's books and records reflect that as of the date that the bankruptcy was filed, NAIC owed the Debtor over $130,000.

g.   The Debtor's books and records were maintained in Halifax, Nova Scotia.

h.   Francis MacKenzie was the president of the debtor and director and all the corporate defendants,

i.    Kevin Kemper served as vice-president for all the same entities.

j.    Lina Tannous served as or assisted the corporate secretary for the Debtor, GRI, NAIC and MMO - all the same entities.

k.    Albert LeBlanc served as internal accountant responsible for the books and records of the Debtor, NAIC and GRI.

l.    Mr. LeBlanc testified that the books and records for all three entities were set up in a single combined electronic accounting system.

m.   Mr. LeBlanc, Mr. Kemper, Ms. Tannous and Mr. Mackenzie were all paid by GRI for work they did on behalf of Debtor.

n.    The Debtor was capitalized by GRI by paying formation costs.

o.    GRI paid all the bills of the Debtor.

p.    Except for the loan from the State of Pennsylvania, all other capital equipment and leasehold improvements were provided by GRI.

q.    The Debtor never experienced a profit and was considered a research and development division of the GRI operation.

r.    The Debtor only did minor work for third parties; all the research and development work it did (99.9%) was done for and at the direction of NAIC on a cost basis.

s.    The financial records of the Debtor and the corporate Defendants were kept on a consolidated basis and were audited by PriceWaterhouseCooper.

t.    The Debtor did not have formal directors' meetings.

u.    The officers of the Debtor used GSI email accounts for work on behalf of Debtor and all the defendant entities.

v.  The Debtor's telephone number rang to a location in Nova Scotia.

w.  Mr. MacKenzie negotiated and arranged the loan transaction with the Commonwealth of Pennsylvania before the Debtor was formed.

x.  GRI provided equipment to the Debtor that the Debtor used in its operations.

y.  Mr. Mackenzie made the decision which creditors would be paid.

z.  The Debtor's tax returns reflect that the Debtor incurred the cost of a bankable feasibility study of NAIC material.

aa. MMI has continued to market the Debtor's facility as its own, see pp. 8 and 16, and to focus on its target markets in the United States, see p. 10: https://docs.wixstatic.com/ugd/6726c6_5cadb579f9f0428a89b4f00618c5f133. pdf

bb. The Debtor was used as an R&D testing lab for GRI.

cc. According to Mr. MacKenzie the Debtor never had revenue.

dd. The Debtor's financial records were kept, and the tax returns were prepared as part of a consolidated group of companies.

**PERSONAL JURISDICTION OVER DEFENDANTS**

12.    The foregoing facts establish that defendants MMI, GRI, NAIC and the Debtor were all controlled by an identifiable core of persons with defendant MacKenzie at the head. MMI served no purpose other than to hold the interests of GRI.  GRI in turn controlled NAIC and the debtor.   Through the identifiable core of persons in control of all day-to-day activities of these four business entities, MMI caused GRI to create the debtor in the Commonwealth of Pennsylvania, encourage the use of debt rather than capital to acquire the equipment and space

for its operation,  to use the debtor as a research and development division for the benefit of the entire enterprise – including doing substantial work solely for the benefit of affiliate, NAIC.

13.     Defendant GRI purposefully availed itself of Pennsylvania law and personal jurisdiction here by creating the debtor in Pennsylvania, sending equipment to Pennsylvania, hiring staff in Pennsylvania, incurring debt in Pennsylvania -- even though it managed the Pennsylvania operations from Canada where it also kept the debtor's records.

14.     Defendant NAIC purposefully availed itself of Pennsylvania law and personal jurisdiction here by entering into transactions with the Pennsylvania debtor that required the debtor to conduct substantial work in and incur debt in Pennsylvania.  NAIC's refusal to pay the sums due the debtor for the work done caused harm in Pennsylvania to debtor's unpaid creditors. Although the mere fact that a subsidiary company does business within a state may not confer jurisdiction over its nonresident parent, in this case, the only work done by the Debtor was for the benefit of NAIC through GRI.  Although it may be true that NAIC did not operate any smelting facilities or furnaces between 2012 and 2017, it instead used the Debtor to do so on its behalf.

15.     Defendant MMI purposefully availed itself of Pennsylvania law and personal jurisdiction here by serving no purpose other than to hold the interests of GRI and reap the benefits of GRI's and NAIC's activities in Pennsylvania. MMI regularly advertised its control over the debtor in Pennsylvania through its marketing materials.

16.     The minimum contacts in bankruptcy proceedings are expanded to a "national contacts" standard, not "Pennsylvania contacts," when determining whether the bankruptcy court has jurisdiction, i.e., in bankruptcy cases "the forum" is the United States in general, not the particular forum state. *Klingher v. Salci (In re Tandycrafts, Inc.)*, 317 B.R. 287, 289 (Bankr. D.

Del. 2004).  Thus, in bankruptcy proceedings, the applicable forum is the United States, not the state in which the debtor filed.

17.    Where a non-resident defendant "purposefully directed his activities at residents of the forum," his contacts with the forum are sufficient to support personal jurisdiction in any "litigation [that] results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotations omitted). A single transaction with the forum by the plaintiff will suffice.  See *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). The defendant's activity need not take place within the forum so long as it is "intentional conduct . . . calculated to cause injury" to the plaintiff within the forum. *Calder v. Jones*, 465 U.S. 783, 791 (1984). See also *Burger King*, 471 U.S. at 476 ("[W]e have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction . . . ."). However, "it is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

18.    In this case, the Trustee's complaint alleges that defendant MacKenzie, as president of all the defendant entities as well as the debtor, directed and participated at the center of a plan to use the debtor and its assets to the sole benefit of the defendants and to the detriment of debtor's creditors.

19.    The Trustee's allegations point to the defendants purposefully directing their activities at the creditors of the debtor who reside in the forum, and that the current suit "arise[s] out of or relate[s] to those activities." See *Burger King*, 471 U.S. at 472.

20.    Defendants complain about the Trustee's use of a handful of isolated quotes strung together from several unrelated documents but clearly the Trustee may use circumstantial

evidence to support her *prima facie* case.  The explanations used by Defendants now to explain away the references merely create issues of material fact to ultimately be decided by the court on the merits after discovery.

21.    While merely entering into a contract with a forum resident may not alone establish minimum contacts, the "real object of the business transaction" including the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" may establish minimum contacts. *Burger King*, 471 U.S. at 479.

22.    Here, the defendants had extensive contacts with the United States in order to create the debtor and operate it in the Commonwealth for their own benefit over a substantial period of time.  Even though the defendants were directing the activity outside of the United States, the harm was caused to creditors in the Commonwealth.

23.    The defendants also complain that the exercise of personal jurisdiction over them in connection with the Trustee's complaint fails to comport with "traditional notions of fair play and substantial justice." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998).  "The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy." *Grand Entm't Group, Ltd. v. Star Media Sales, Inc*., 988 F.2d 476, 483 (3d Cir. 1993). See also *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

24.    Because the Trustee has made a prima facie case of minimum contacts, the burden shifts to defendants to "present a compelling case that the presence of some other consideration

should render jurisdiction unreasonable." *Grand Entm't Group*, 988 F.2d at 483 (quotations omitted).

25.     Here the defendants clearly directed conduct toward creditors located in Pennsylvania in the United States.  They sought various business ventures in connection with the debtor and in other capacities in the United States.  They are unable to present a compelling reason that would render jurisdiction unreasonable.

26.     "[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and . . . is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).  Taking the Plaintiff's allegations as true, the Court must conclude that they are sufficient to establish that defendants had minimum contacts with the forum. Thus, the Court must conclude that the Plaintiff has established that the Court has personal jurisdiction over defendants with respect to the claims raised in the Complaint. See *Burger King*, 471 U.S. at 472.

27.     As Plaintiff's opposition to Defendants' motion to dismiss explains, injuries to the debtor and its creditors is real and concrete, and this Court has jurisdiction to remedy the harm. But should this Court have any doubt, Plaintiffs move, in the alternative, for limited jurisdictional discovery to confirm their allegations regarding the Defendants' injurious activities directed to this forum state.

28.     Given the specificity of Plaintiffs' factual allegations, the liberal standard for seeking jurisdictional discovery, and recent revelations about Defendants' activities, jurisdictional discovery is required before the case may be dismissed for lack of personal jurisdiction.  If the movants seek to present an evidentiary record on their motion to dismiss, the

Trustee is entitled to a scheduling order that provides an opportunity for discovery and preparation for the evidentiary hearing.

### THE TRUSTEE'S COMPLAINT STATES CLAIMS AGAINST ALL DEFENDANTS

29.    Defendants also move to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim.

30.    A Rule 12(b)(6) motion serves to test the sufficiency of the factual allegations in a plaintiff's complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "In deciding a motion to dismiss, we must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004). See also *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (stating that the Supreme Court in *Twombly* "reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits"). All reasonable inferences are drawn in favor of the plaintiff. *Kost*, 1 F.3d at 183. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982). See also *Maio v. Aetna, Inc*., 221 F.3d 472, 482 (3d Cir. 2000); *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 134 (Bankr. D. Del. 2005) ("Granting a motion to dismiss is a 'disfavored' practice . . . .").

31.    Rule 8(a) of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement must provide "the defendant fair notice of what the . . . claim

is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 8, a complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Twombly*, 550 U.S. at 555 (citations omitted). In other words, "Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief. . . . [W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." *Phillips*, 515 F.3d at 232 (citing *Twombly*, 550 U.S. at 556 n.3).  Separate "counts" are not required.

32.     Section 544   of the Bankruptcy Code gives the trustee in bankruptcy the status of a hypothetical judgment lien creditor. 11 U.S.C. § 544(a)(1). The trustee hypothetically extends credit to the debtor at the time of filing and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor.   The advantage of this status derives not from the Bankruptcy Code but, rather, from the relevant state law defining creditor rights.   See *In re Kors, Inc.*, 819 F.2d 19, 22-23 (2d Cir.1987) ("Once the trustee has assumed the status of a hypothetical lien creditor under § 544(a)(1), state law is used to determine what the lien creditor's priorities and rights are."); *In re Vienna Park Properties*, 976 F.2d 106, 115 (2d Cir.1992).   Section 544(a)(1) thus puts the trustee in the position of an ideal lien creditor, armed with a judgment and with all the power that state law confers on such ideal creditors.     See *Kors*, 819 F.2d at 23; see also *In re Halabi*, 184 F.3d 1335, 1337 (11th Cir.1999); *In re Hartman Paving, Inc.,* 745 F.2d 307, 311 (4th Cir.1984).

33.     Pennsylvania state and federal courts applying Pennsylvania law have long listed a vast set of factors that the court may consider in its decision to disregard the corporate shield,

including, among others, using the corporate form as a sham to pursue fraudulent activities or to cause injustice, ignoring corporate formalities, undercapitalizing the company and exerting control to influence the corporate decisions and actions for personal interests. A combination of any number of these factors may convince the court that equity requires holding the owner personally liable for corporate debts, see, *Good v. Holstein*, 787 A.2d 426, 430 (Pa.Super. 2001); *E. Minerals & Chemicals v. Mahan*, 225 F.3d 330, 336 (3d Cir. 2000).

34.     The creditors of a subsidiary in a corporate group may plead veil-piercing to hold the parent company liable for the debts of the subsidiary. This is especially prevalent in cases such as this where the subsidiary is undercapitalized while the parent company has sufficient resources to cover the contractual or tortious damages caused by the subsidiary.   The Pennsylvania courts have applied the same factors to the corporate groups to determine if a parent company is liable for its subsidiary's debts under the doctrine of piercing the corporate veil, as in *Allegheny Energy Supply v. Wolf Run Minerals*, 53 A.3d 53, 59 (Pa. Super. Ct. 2012).

35.      Under Pennsylvania law, the piercing of the corporate veil is not an independent cause of action, the plaintiff need only plead the factors that she relies on and provide supporting evidence. See, e.g., *In re Gigliotti*, 507 B.R. 826, 840 (Bankr. E.D. Pa.).

36.     As long as the plaintiff pleads the factors and substantive elements of veil-piercing in her request, she does not necessarily identify her request as piercing the corporate veil to succeed, as in *Calkins v. Wolk*, (Pa. Super. Ct. June 26, 2018) https://www.casemine.com/judgement/us/5b3494ed24bff6242f230029.

37.     Creditors of the Debtor relied on Defendants' representations that the Debtor was a division of Defendants, an integral component of the overall enterprise and not a separate corporate entity. They had no reason to believe that they were dealing with a separate entity due

to the representations and control exhibited by Defendants. The Defendants violated duties owed to the Debtor's creditors by among other things abandoning the Debtor's assets and failing to pay its bills despite the benefits they derived from the Debtor.

38.   The facts set forth in the complaint provide ample support for the Trustee's *prima facie* case of piercing the corporate veil / alter ego / enterprise liability against the corporate defendants enabling the Trustee to commence execution on defendants with respect to the Trustee's hypothetical judgment against the debtor for all the remaining unpaid claims due creditors of this estate.

39.   The complaint clearly outlines facts that support the conclusion that Mr. MacKenzie ceased to fund Debtor despite the extremely valuable unpaid services that the Debtor had provided to NAIC.  He clearly preferred one entity over the other and in so doing breached his duty of loyalty to the Debtor. His actions were not taken in the best interests of the Debtor or of GRI but of NAIC – a clear breach of duty. Since the debtor was never fully capitalized and was, at all times in the zone of insolvency, Mr. MacKenzie owed a duty not to the shareholder but to the Debtor's creditors.

40.   Of course, the circumstantial evidence amply suggests that all defendants benefited from Mr. MacKenzie directing the Debtor to operate in a thinly capitalized fashion that only directly benefited a subsidiary by siphoning value away from the Debtor and its creditors but was used as a marketing tool for all the others.  The Defendants actively encouraged, funded, or otherwise assisted him in connection with the misconduct.

41.   The complaint clearly sets forth facts that NAIC received the uncompensated benefit of Debtor's service for less that reasonably equivalent value.  The facts also establish that the Debtor was never solvent.

42.     The Trustee's Complaint also states a clear claim against defendant NAIC for the
$130,000 plus that is owed the Debtor based on the Debtor's books and records.

43.     The Trustee's Complaint states a claim against defendant MacKenzie under (1)
the participation theory of liability for corporate officers and/or (2) a concerted tortious conduct
theory.

44.     A corporation is a legal entity, acting through its agents. The corporate entity is
"accountable for any acts committed by one of its agents within his actual or apparent scope of
authority and while transacting corporate business." *Am. Film Techs.*, 175 B.R. at 854. In
addition, corporate officers and directors may be held accountable personally for their tortious
conduct. *Loeffler v. McShane*, 539 A.2d 876, 878 (Pa. Super. Ct. 1988).

45.     The Pennsylvania Supreme Court has recognized the participation theory of
liability:

> The general, if not universal, rule is
> that an officer of a corporation who takes
> part in the commission of a tort by the
> corporation is personally liable therefor;
> but that an officer of a corporation who
> takes no part in the commission of the tort
> committed by the corporation is not
> personally liable to third persons for such a
> tort, nor for the acts of other agents,
> officers or employees of the corporation in
> committing it, unless he specifically
> directed the particular act to be done or
> participated, or cooperated therein.
> Liability under this theory attaches
> only where the corporate officer is an actor
> who participates in the wrongful acts.
> Therefore, corporate officers may be held
> liable for misfeasance . . . [but] may not be
> held liable for mere nonfeasance.

*Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983) (citations omitted).

46.     Pennsylvania also recognizes a tort for concert of action. *Koken v. Steinberg*, 825

A.2d 723, 731 (Pa. Commw. Ct. 2003). The Restatement (Second) of Torts explains this theory:

> For harm resulting to a third person from the
> tortious conduct of another, one is subject
> to liability if he
> (a) does a tortious act in concert with the
> other or pursuant to a common design with
> him, or
> (b) knows that the other's conduct
> constitutes a breach of duty and gives
> substantial assistance or encouragement to
> the other so to conduct himself, or
> (c) gives substantial assistance to the other
> in accomplishing a tortious result and his
> own conduct, separately considered,
> constitutes a breach of duty to the third
> person.

Restatement (Second) of Torts § 876.

47.     Besides failing to pay sums due reflected on the Debtor's books, NAIC also

complains that the Trustee's count setting forth how Debtor charged NAIC substantially less for

its services than the value provided is "meritless", but the facts set forth in the complaint clearly

set forth a viable fraudulent transfer cause of action.

48.     The complaint clearly sets forth the facts concerning how the Defendants directly

or indirectly received benefits and/or services from the Debtor for which they have unjustly

failed to remit the full value of those services. The facts show that Mr. MacKenzie used his

influence over the entire enterprise to cause the Debtor to provide valuable services to NAIC for

a fraction of what the services were worth. The full value of these services was siphoned to

Defendants for their own use.  This unconscionable conduct and breach of duty served to harm

the Debtor's creditors.

49.     Plaintiffs' factual allegations about Defendants' activities are detailed, concrete, well-supported, and well-pleaded. As such, at this stage of this litigation, these allegations must be taken as true, including establishing jurisdiction. *Carino v. Stefan,* 376 F.3d 156, 159 (3d Cir. 2004). *See also Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) (stating that the Supreme Court in Twombly "reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits").

50.     To the extent that the defendants seek to counter the well plead facts set forth in the Trustee's complaint by way of Mr. MacKenzie's affidavit, the motion is premature.

51.     The facts in this case are complicated, with many factual twists and turns. See, e.g., *Star Spa Servs. Inc. v. Robert G. Turano Ins. Agency, Inc*., 595 F.Supp.2d 519, 529 (M.D. Pa. 2009).  This complicated factual situation would be best determined through discovery, and then resolved by trial and not by a motion for what is essentially a premature motion for partial summary judgment.

52.     Defendants attempt to obfuscate the truth by explaining away the circumstantial evidence collected by the Trustee.  The circumstantial evidence collected by the Trustee warrants full discovery of these important factual issues.

53.     The facts and additional information must be obtained through discovery before responding to a motion for summary judgment.  Fed. R. Civ. P. 56 (d).   "[T]he Supreme Court has restated the rule as requiring, rather than merely permitting discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Intern., Inc. v. Wornick,* 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 n. 5 (1986)).

54.     Federal Rule of Civil Procedure 56(d) permits a party opposing a motion for summary judgment to show by declaration specific reasons why it is presently unable to present facts "essential to justify its opposition" to the motion.  Development of a full factual record through discovery is essential for adequate resolution of the issues of fact raised by the Motion. Until a factual record is fully developed and presented to this Court, there is no need for the Court to resolve these questions again, devoid of an evidentiary factual inquiry.

55.     In this case, the complaint is well founded on documents provided by the Debtor and the testimony of its officers and internal accountant. While the defendants here have not filed an answer to the complaint, it would appear that the records and testimony obtained by the Trustee amply create material issues of fact that will require further elucidation after discovery.

56.     The Court has the discretion to defer consideration of the defendants' motion until after a period of discovery and an evidentiary trial in order for a full record to be developed. *Williams v. Howard Johnson's Inc. of Washington*, 323 F.2d 102, 105 (4th Cir. 1963) (Courts have the "discretion to postpone consideration of the motion for summary judgment until after a hearing . . . particularly . . .where the trial is called upon to decide a constitutional question on summary judgment on a potentially inadequate factual presentation.").

57.     The U.S. Supreme Court has recognized that "[w]hile we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide." *Kennedy v. Silas Mason Co*., 334 U.S. 249, 257, 68 S. Ct. 1031, 1034, 92 L. Ed. 1347 (1948).

58.     As set forth at length above, the Plaintiff has identified specific facts that she believes to exist; these facts are essential to Plaintiff's opposition to Defendants' Motion to

Dismiss.  In a fact-intensive case such as this one, it is imperative that both parties have the opportunity to thoroughly conduct discovery, provide expert testimony, and contest facts as necessary.

Wherefore, the Trustee seeks an order denying the defendants' motion to dismiss.  In the event that an evidentiary hearing is set by the court on the defendants' motion, the Trustee seeks an opportunity to conduct discovery to confirm her allegations regarding the Defendants' injurious activities directed to this forum state and the defendants' overall connections with the United States.

GELLERT SCALI BUSENKELL & BROWN LLC

By:        /s/ *Gary F. Seitz*
           Gary F. Seitz (PA ID #52865)
           Holly S. Miller (PA ID # 203979)
           Gellert Scali Busenkell & Brown LLC
           8 Penn Center
           1628 John F. Kennedy Blvd, Ste 1901
           Philadelphia, PA 19103
           Telephone:  215-238-0010
           Facsimile:  215-238-0016
           gseitz@gsbblaw.com
           hsmiller@gsbblaw.com
           *Counsel to the Chapter 7 Trustee*

Dated: February 4, 2021